**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| **ROBERT F. KENNEDY,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | **CASE NO. 2:23-cv-004-Z** |
| | § | |
| **THE WASHINGTON POST CO.,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

**<u>BRIEF IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT</u>**
**<u>THE ASSOCIATED PRESS</u>**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................... 3

    A.  The AP and Other Publisher Defendants ................................................. 3

    B.  The Trusted News Initiative ..................................................................... 4

    C.  Plaintiffs ................................................................................................... 5

III. LEGAL STANDARD ......................................................................................... 6

IV. ARGUMENT ....................................................................................................... 7

    A.  Plaintiffs Lack Article III Standing ......................................................... 7

    B.  Plaintiffs Lack Antitrust Standing ......................................................... 10

        1.  Plaintiffs Do Not Allege They Have Suffered Antitrust Injuries ............ 11

        2.  Plaintiffs Do Not Have Antitrust Standing Because Their Alleged
            Injuries Cannot Be Linked to The AP's Conduct ..................................... 15

    C.  Plaintiffs Fail to Allege a *Per Se* Group Boycott Claim ....................... 16

        1.  Plaintiffs Fail to Allege That TNI Members Have a Dominant
            Position in The Supposed Market for Online News ................................. 17

        2.  Plaintiffs Fail to Allege That TNI Members Cut off Plaintiffs'
            Access to Any Facility Necessary to Compete ......................................... 19

    D.  Plaintiffs Fail to Allege The Conduct of TNI Members Had Any Anti-
        Competitive Effects in The Supposed Online News Market ............................... 22

V.  CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*,
No. SA-17-CA-1122, 2022 WL 18076843 (W.D. Tex. July 14, 2022)...................................22

*Adams v. Am. Bar Assoc.*,
400 F. Supp. 219 (E.D. Pa. 1975) ...........................................................................................13

*Anago, Inc. v. Tecnol Med. Prods.*,
976 F.2d 248 (5th Cir. 1992) ..................................................................................................11

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ..............................................................................................................1

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................................6

*Associated Press v. United States*,
326 U.S. 1 (1945) ....................................................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................6

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ..................................................................................................................1

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...........................................................................................................11, 12

*Buchholz v. Tanick*,
946 F.3d 855 (5th Cir. 2020) ....................................................................................................7

*Chair King, Inc. v. Houston Cellular Corp.*,
131 F.3d 507 (5th Cir. 1997) ....................................................................................................6

*Children's Health Def. v. Facebook Inc.*,
546 F. Supp. 3d 909 (N.D. Cal. 2021) ......................................................................................9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..................................................................................................................8

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) ........................................................................................ *passim*

*DataCell Ehf v. Visa, Inc.*,
  No. 1:14–CV–1658 GBL/TCB, 2015 WL 4624714 (E.D. Va. July 30, 2015)..................13, 14

*Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S.*,
  50 F.3d 710 (9th Cir. 1995) ........................................................................................14

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  123 F.3d 301 (5th Cir. 1997) ............................................................10, 11, 15, 22

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*,
  2019 WL 3503240 (N.D. Tex. Aug. 1, 2019).........................................................23

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) .......................................................................................7

*Flaa v. Hollywood Foreign Press Ass'n*,
  55 F.4th 680 (9th Cir. 2022) .....................................................................................18

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986).....................................................................................................16

*Ginzburg v. Mem'l Healthcare Sys.*,
  993 F. Supp. 998 (S.D. Tex. 1997) .....................................................................11, 12

*Hughes v. Tobacco Inst., Inc.*,
  278 F.3d 417 (5th Cir. 2001) .....................................................................................12

*Johnson v. Comm'n on Presidential Debates*,
  869 F.3d 976 (D.C. Cir. 2017) ...................................................................................13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)........................................................................................................7

*McCormack v. Nat'l Collegiate Athletic Assoc.*,
  845 F.2d 1338 (5th Cir. 1988) ...................................................................................15

*McMahon v. Fenves*,
  946 F.3d 266 (5th Cir. 2020) ......................................................................................7

*MM Steel, L.P. v. JSW Steel USA Inc.*,
  806 F.3d 835 (5th Cir. 2015) .....................................................................................17

*Norris v. Hearst Tr.*,
  500 F.3d 454 (5th Cir. 2007) ........................................................................... *passim*

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
  472 U.S. 284 (1985).......................................................................................... *passim*

*Ohio v. Am. Express Co.*,
 138 S. Ct. 2274 (2018) ................................................................................22, 23

*Ortiz v. Am. Airlines, Inc.*,
 5 F.4th 622 (5th Cir. 2021) .........................................................................7

*R2 Invs. LDC v. Phillips*,
 401 F.3d 638 (5th Cir. 2005) .......................................................................6

*Reiter v. Sonotone Corp.*,
 442 U.S. 330 (1979)................................................................................1, 11

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
 365 F.3d 353 (5th Cir. 2004) .......................................................................6

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016)................................................................................7

*Suarez v. iHeartMedia + Entm't, Inc.*, No. SA-18-CV-1237-XR, 2019 WL
 286186 (W.D. Tex. Jan. 22, 2019)...........................................................10

*Transource Int'l, Inc. v. Trinity Indus., Inc.*,
 725 F.2d 274 (5th Cir. 1984) .....................................................................10

*Tunica Web Adver. v. Tunica Casino Operators Ass'n*,
 496 F.3d 403 (5th Cir. 2007) ........................................................... *passim*

*U.S. v. Hays*,
 515 U.S. 737 (1995)....................................................................................6

*United Biologics, LLC v. Allergy & Asthma Network*,
 Case No. 5:14-35, 2019 WL 830967 (W.D. Tex. Feb. 21, 2019)...............17, 21, 22

*Viazis v. Am. Ass'n of Orthodontists*,
 182 F. Supp. 2d 552 (E.D. Tex. 2001) ......................................................23

**Statutes**

28 U.S.C. § 1404(a) ...........................................................................................3

**Other Authorities**

Fed. R. Civ. P. 12(b) .....................................................................................3, 6

The Associated Press, *About Us*, https://www.ap.org/about/ ......................3, 4

Robert H. Bork, The Antitrust Paradox 66 (1978)..........................................11

TrialSite News, *About Us*, https://www.trialsitenews.com/about-us............13

## I.      INTRODUCTION

In this suit, a group of a dozen loosely aligned organizations and self-described online journalists attempt to turn their prior complaints about technology companies at times removing or disfavoring their content on those companies' Internet platforms into antitrust claims against four news publishers.  Their Complaint alleges that, in order to combat the spread of harmful disinformation, the publishers, together with other news publishers and technology companies not named as defendants here, formed the Trusted News Initiative ("TNI").  To that end, TNI members share information about potentially harmful disinformation.  Plaintiffs have attempted to turn their allegations about this collaborative information-sharing initiative into a supposed economically motivated group boycott by news publishers.  But, as revealed by Plaintiffs' own allegations, the TNI has had no impact on competition or consumers in the supposed market for online news. Plaintiffs remain free to publish their news on their own websites and many other online platforms, including many of those owned by TNI's technology company members.  Moreover, Plaintiffs' complaints about alleged censorship, including their complaints about lost donations, are not economic in nature and thus cannot be redressed by the antitrust laws.

Plaintiffs' contentions regarding freedom of speech and the marketplace of ideas distort the antitrust laws.  As even they candidly admit, this "is [ ] an action to defend the freedom of speech and of the press."  ECF No. 1 at ¶2.  The antitrust laws, however, were created by Congress to protect free market competition, not to protect the free exchange of ideas.  Accordingly, as the Supreme Court recognized in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979), the antitrust laws are concerned with the protection of competition and "consumer welfare."  *See also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019) ("Ever since Congress overwhelmingly passed and President Benjamin Harrison signed the Sherman Act in 1890, protecting consumers from monopoly prices' has been 'the central concern of antitrust.") (internal citation omitted); *Brooke*

*Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993) (noting the "antitrust laws' traditional concern for consumer welfare and price competition"). Plaintiffs seemingly confuse the purposes behind the Sherman Act with the First Amendment. In fact, whether or not Plaintiffs can claim any First Amendment rights has no bearing on whether Plaintiffs have stated viable antitrust claims. They have not, for multiple independent reasons.

**First**, Plaintiffs lack both Article III and Sherman Act standing to bring these claims. They have failed plausibly to allege that the challenged acts of Defendants, rather than acts by third parties, caused their claimed injuries, or that their injuries are fairly traceable to the alleged restraint of trade. Moreover, because their claimed injuries – which range from supposed drops in charitable donations to decreased fundraising for a documentary film and alleged losses in patients at a chiropractic practice – are abstract and speculative, Plaintiffs have failed plausibly to allege that they have suffered any injury in fact. Similarly, Plaintiffs cannot satisfy the separate threshold requirement of showing standing under the Sherman Act to pursue their claims. The various injuries they claim do not result from the alleged restriction of competition by Defendants in the supposed online news market.

**Second**, Plaintiffs fail to allege sufficient plausible facts to state either a *per se* or rule of reason group boycott claim under Section 1 of the Sherman Act. As the Supreme Court has explained, a group boycott typically is *per se* illegal where it "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete … and frequently the boycotting firms possessed a dominant position in the relevant market." *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Indeed, the Fifth Circuit has opined that "the touchstone of per se illegality is that the customers or suppliers of the plaintiff had, as a group, agreed or been forced to cease doing business with the plaintiff." *Consol. Metal Prods.,*

*Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 291 (5th Cir. 1988).  Here, TNI's dozen or so members lack a dominant position as competitors in the allegedly vast market for online news, nor have Defendants here – or TNI more generally – cut off Plaintiffs' access to anything.  Moreover, Plaintiffs fail to plausibly allege that the four Defendant publishers had any ability to force TNI's technology company members to cease doing business with Plaintiffs or that the technology platforms had any economic motivation to agree to do so.  And finally, Plaintiffs' rule of reason claim fails due to their failure to plausibly allege that TNI's alleged conduct had any anticompetitive effect in the supposed online news market.

For each and all of these reasons, as explained more fully below, the Court should dismiss all of Plaintiffs' claims.[1]

## II.    FACTUAL BACKGROUND[2]

### A.    The AP and Other Publisher Defendants

The Associated Press ("The AP") is a global non-profit news organization dedicated to factual reporting.  Headquartered in New York, The AP maintains news bureaus throughout the world, with more than 250 locations worldwide.  The Associated Press, *About Us*, https://www.ap.org/about/ (last visited Feb. 21, 2023).  For nearly 170 years, The AP has provided quality reporting to the American public and beyond.  ECF No. 1 ¶112.  In that time, The AP has

---

[1] By moving to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), The AP is not waiving any objection to venue and specifically reserves the right to move to transfer pursuant to 28 U.S.C. § 1404(a).  The AP has filed this motion to dismiss because The AP's deadline to respond to the Complaint is today; however, all parties have consented to brief issues on a joint schedule and the consented-to motion to set that schedule is pending before the Court.  *See* ECF No. 19.  Should the Court set a joint schedule, The AP would coordinate with the parties to present the issues jointly before the Court in accordance with that schedule.

[2] As required by Federal Rule of Civil Procedure 12, The AP accepts the well-pleaded allegations of the Complaint as true for purposes of this motion only.

won 56 Pulitzer Prizes. The Associated Press, *About Us*, https://www.ap.org/about/ (last visited Feb. 21, 2023).  The AP publishes reporting from "its members and subscribers, totaling more than 1,300 newspapers and broadcasters" as well as its own journalism on a variety of platforms, including on its own website, apnews.com, and through other physical print and online channels. *Id.*

The Washington Post Co., ("The Post"), the British Broadcasting Corporation (the "BBC"), and Reuters News and Media, Inc. ("Reuters") are news publishers.  *Id.* ¶¶110-13.  The Post is "one of the nation's leading newspapers, which publishes its content both in print and online at the washingtonpost.com[.]"  *Id.* ¶110.  The BBC is "the national broadcasting service of the United Kingdom." *Id.* ¶111.  And Reuters "distributes reporting to newspapers and broadcasters all over the world, and operates a news website, reuters.com[.]" *Id.* ¶113.

**B.    The Trusted News Initiative**

Plaintiffs allege that publishers, including Defendants, and technology companies, none of which are named as defendants here, formed an international initiative to combat the spread of harmful disinformation.  *Id.* ¶¶254-56; *see also id.* ¶297 (alleging that TNI includes technology companies such as Google, Meta, and Twitter).  Plaintiffs allege TNI "developed a shared early-warning system to alert partners about disinformation" in real time and that  "the TNI members had agreed to adopt, and did adopt, a 'fast alert' system in which members would alert one another to items of supposedly unreliable information that had appeared online." *Id.* ¶¶256, 262.  This allegedly included alerting members about harmful disinformation relating to critical issues, including the COVID-19 virus and vaccines and the 2020 U.S. election. *Id.* ¶¶257-59.  TNI holds regular summits and conferences open to the public at which TNI members discuss their efforts to combat the spread of harmful disinformation online. *Id.* ¶¶259-60.

C.      **Plaintiffs**

Plaintiffs consist of nearly a dozen organizations and individuals located in states across the country whose only connection appears to be that they all allege that they are "original-content news publishers" and they each claim that technology companies that are TNI members (but which are not named as defendants) have taken some kind of action against them, from removing their content to suspending or disabling their accounts.  *Id.* ¶181.

Children's Health Defense ("CHD") posts a weekly newsletter and wrap up on its website https://www.childrenshealthdefense.org.  *Id.* ¶39.   Robert F. Kennedy, Jr. is the founder and chairman of CHD.  *Id.* ¶44.[3]   Trialsite, Inc. operates the online site TrialSite News ("TSN").  *Id.* ¶41.   Creative Destruction Media, LLC ("CD Media"), which is 95% owned by Mr. L. Todd. Wood who is not himself a plaintiff in this action, operates websites in several languages.  *Id.* ¶¶52-53, 56.  Erin Elizabeth Finn sells health-related products and posts content online including on the website HealthNutNews.  *Id.* ¶60.  Dr. Ben Tapper is a chiropractor and documentary filmmaker, and posts videos and other content on social media.  *Id.* ¶68.  Jim Hoft founded, owns, and operates the website the Gateway Pundit, allegedly "one of the Internet's most popular and important conservatively oriented destinations for news and commentary."  *Id.* ¶¶74-75.  Mr. Ben Swann is the founder, owner, and chief executive of the website Truth in Media.  *Id.* ¶86.  Ty and Charlene   Bollinger   are   the   founders,   owners,   and   operators   of   two   websites: thetruthaboutcancer.com and thetruthaboutvaccines.com.  *Id.* ¶95.  Dr. Joseph Mercola is the founder and owner of Mercola.com.  *Id.* ¶102. Plaintiffs allege they were each "censored, disparaged, shadow-banned, and de-platformed on one or more TNI member platforms."  *Id.* ¶356.

---

[3]  Plaintiffs' Complaint includes two different sets of paragraphs numbered 41 through 49.

In January 2023, Plaintiffs brought this antitrust suit against four news publishers who are members of TNI alleging that the TNI is a group boycott that is an unlawful restraint of trade under the Sherman Act's *per se* and rule of reason frameworks.

## III.   LEGAL STANDARD

The AP moves to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dismissal of a claim under Rule 12(b)(1) is proper when a plaintiff lacks standing to sue in federal court.  *See Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509-10 (5th Cir. 1997), *abrogated on other grounds by Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 376 (2012).  Standing is a jurisdictional question, which must be resolved as a preliminary matter as to *each* Plaintiff.  *U.S. v. Hays*, 515 U.S. 737, 742-43 (1995).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  While the Court must accept as true all well-pleaded factual allegations and construe them in the light most favorable to the nonmovant, it must "not strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions."  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353 (5th Cir. 2004)); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (affirming district court's dismissal of an antitrust claim for lack of antitrust standing).  Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Plaintiffs' claims fall short of these well-established standards.

## IV.     ARGUMENT

### A.     Plaintiffs Lack Article III Standing

Under basic standing principles, a plaintiff must have "suffered an injury in fact," that is, "a personal injury that is traceable to the defendant's alleged conduct and that is likely to be redressed by a favorable decision . . . .  This injury must be both 'concrete' and 'particularized.'" *McMahon v. Fenves*, 946 F.3d 266, 271 (5th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized . . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).  "A concrete injury is, like it sounds, 'real and not abstract.'"  *Buchholz v. Tanick*, 946 F.3d 855, 861 (5th Cir. 2020) (quoting S*pokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).  Further, the injury must be fairly traceable to the alleged acts of the Defendants.  Put another way, "there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560; *see also Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 629 (5th Cir. 2021) ("[T]he question is whether Plaintiffs have demonstrated that  . . . the challenged acts of the defendant, not of some . . . third party' (including themselves) caused the injury.") (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)).  Thus, in order to have Article III standing to bring this suit, each of the Plaintiffs must plausibly allege that he, she or it has individually suffered an injury in fact traceable to Defendants' alleged conduct.  None of the Plaintiffs has done so.

The allegations, though lengthy, do not make it plausible that any alleged injuries were caused by acts of The AP (or the other Defendants), rather than by third parties.  Several Plaintiffs make allegations about losses in expected donations.  *See, e.g.*, *id.* ¶358 (loss of $1 million in

donations and membership dues), ¶399 ($15,000 per month in fundraising losses for a documentary film). Not only are there no facts alleged even attempting to connect these "losses" in expected donations to the actions of The AP (or the other Defendants), these are losses of anticipated donations of funds from third parties. These third parties could have decided not to donate their funds to Plaintiffs for many reasons completely unrelated to any supposed censorship by TNI members. Similarly, one Plaintiff alleges that he has lost revenue from his chiropractic practice, but patients may have decided to stop using his services for any number of reasons. *Id.* ¶399. Even more tenuously, two Plaintiffs allege that they were harmed when payment services, including PayPal, Stripe, and Venmo, disabled or suspended their accounts. *Id.* ¶¶380, 398. Neither Plaintiff makes any plausible allegations connecting the actions taken by these third-party payment processors to the alleged censorship by TNI's technology company members. Their accounts may have been suspended for any number of reasons, including violation of the processors' terms of service. As the Supreme Court has instructed, standing cannot "rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (holding that "speculative chain of possibilities" did not provide standing).

Moreover, Plaintiffs also fail to allege facts that establish that these losses are fairly traceable to The AP (or the other Defendants) rather than the unilateral actions of various technology companies, none of which are named as defendants here, with no causal link to TNI. For example, Hoft argues that traffic to his website dropped after a Facebook algorithm change. ECF No. 1 at ¶421. Even more telling, several Plaintiffs allege technology companies took action against them when they violated those companies' standards or rules. For example, TSN alleges Facebook removed one of its posts as "violating community standards[,]" *id.* ¶366, and "Twitter suspended Dr. Tapper's account for violating Twitter rules." *Id.* ¶397. There is a paucity of

allegations that the technology platforms that are alleged to be TNI members, none of whom are defendants in this case, took actions because any of Plaintiffs' information was flagged by The AP or another Defendant pursuant to the TNI.  For example, the Complaint alleges various actions that FaceBook took with respect to the CHD, including de-platforming it.  But, there are no allegations of fact that link those actions to TNI.  In fact, it is more plausible that FaceBook took the actions against the CHD because it independently decided that the organization was in violation of its terms of service, especially given the allegations that FaceBook took actions against other Plaintiffs for "violating community standards."[4]

Apparently recognizing this legal deficiency, Plaintiffs concede that they lack the facts to allege that the technology platforms were acting in unison when taking action against Plaintiffs, *see id.* ¶360, and that they cannot allege that the platforms coordinated the circumstances or timing of specific boycotting activity aimed at any particular Plaintiff, *id.* ¶361, but nonetheless baldly assert that there is temporal proximity of actions that span many months that "suggests" concerted action, *id.* ¶359.  This paucity of factual allegations cannot suffice to make the allegations even plausible.  Plaintiffs accordingly lack Article III standing because they have not adequately alleged that they have each suffered injuries in fact fairly traceable to Defendants' complained-of conduct.

Compounding this deficiency, the injuries Plaintiffs allege are not concrete or particularized, but, rather, are entirely speculative.  Plaintiffs claim that they have suffered harm in the form of monetary losses as a result of supposed censorship but all of the monetary losses they allege are entirely abstract and speculative.  *See generally id.* ¶¶356-464.  For example, CHD

---

[4]   Indeed, at least some of the Plaintiffs have admitted elsewhere that others not named as defendants here caused the purported injury:  CHD previously sued FaceBook, alleging in that case that FaceBook in concert *with the federal government* was fact-checking and labeling its content and taking steps to censor and block its content.  *See Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909, 915 (N.D. Cal. 2021).

claims, with no support whatsoever, that supposed censorship by three technology companies has caused it damages of over $1,000,000 in lost donations and memberships. *Id.* ¶358. And CHD's founder Mr. Kennedy, again with no supporting factual allegations, claims he has suffered $75,000 in damages on top of that. *Id.* ¶362. Similarly, Ms. Finn alleges she has personally suffered at least $2,000,000 in damages and Mr. Swann alleges he personally suffered more than $20,000,000 in damages, without any factual support whatsoever. *Id.* ¶¶392, 441. The nearest any Plaintiff comes to stating a concrete injury is Mr. Hoft who alleges that revenue for his site would be 130% higher absent the alleged censorship, resulting in at least $25,000,000 in damages, but he fails to make any plausible factual allegations about his site's actual revenue to support this. *Id.* ¶426. No Plaintiff points to any concrete loss in income that resulted from their posts or accounts being removed by TNI's technology company members.

### B.      Plaintiffs Lack Antitrust Standing

In addition to Plaintiffs' inability to demonstrate Article III standing, the Sherman Act imposes a threshold standing requirement that must be met by all antitrust plaintiffs. *See Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 280 (5th Cir. 1984) ("The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint." (internal citations omitted)). Failure to allege antitrust standing is grounds for dismissal. *See Norris*, 500 F.3d at 469 (affirming district court's dismissal of antitrust claims "for lack of antirust injury and antitrust standing"). To establish antitrust standing, Plaintiffs must allege plausible facts establishing (i) injury-in-fact, (ii) antitrust injury, and (iii) proper plaintiff status. *Suarez v. iHeartMedia + Entm't, Inc.*, No. SA-18-CV-1237-XR, 2019 WL 286186, at *2 (W.D. Tex. Jan. 22, 2019) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)). Plaintiffs have failed to allege antitrust standing because the injuries

they allege are not antitrust injuries and, further, are too attenuated from Defendants' alleged conduct to confer antitrust standing.

### 1.    Plaintiffs Do Not Allege They Have Suffered Antitrust Injuries

The various injuries claimed by Plaintiffs, including supposed decreases in charitable donations, losses to fundraising efforts for a documentary film and losses in book sales by a non-plaintiff, do not qualify as antitrust injuries.  An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-OMat, Inc.*, 429 U.S. 477, 489 (1977).  "It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Id.*  The injuries claimed by Plaintiffs here do not flow from the alleged restriction of competition in the supposed market for online news for a number of reasons.

The purpose of antitrust law is the promotion of "consumer welfare." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting Robert H. Bork, The Antitrust Paradox 66 (1978)). Indeed, the Fifth Circuit has embraced this understanding and recognized that the antitrust standing requirement "ensures that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, ***not competitors***." *Doctor's Hosp.*, 123 F.3d at 306 (emphasis added); *see also Norris*, 500 F.3d at 467 ("[T]he Sherman Act was enacted to assure customers the benefits of price competition").  Accordingly, Plaintiffs must allege antitrust injuries, those injuries that reflect anticompetitive effects, typically "includ[ing] increased prices and decreased output." *Anago, Inc. v. Tecnol Med. Prods.*, 976 F.2d 248, 249 (5th Cir. 1992).  In sum, "an antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare." *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (internal citation omitted).

Here, Plaintiffs fail to allege they suffered any harm of the type "the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489.  Plaintiffs did not suffer the type of loss that the claimed violations would be likely to cause or the kind of loss that would flow from an unlawful restraint of trade.  Plaintiffs claim that TNI members "suppressed competition in the online news market," ECF No. 1 ¶16, but the harms that they claim to have suffered have nothing to do with competition in that market.  Although Plaintiffs' actual claimed injuries vary widely as described below, as a whole they argue that they were "censored, disparaged, shadow-banned, and de-platformed on one or more TNI member platforms, causing [them] substantial monetary loss." *Id.* ¶356.  Examples of these claimed monetary losses include lost donations and membership fees, *id.* ¶¶41-42, lost in-video sponsorship opportunities, *id.* ¶368, losses in expected investment capital, *id.* ¶386, lost book sales by L. Todd Wood, who is not even a Plaintiff in this action himself, *id.* ¶387, losses from a chiropractic practice, *id.* ¶399, and losses in fundraising for a documentary film. *Id.* ¶400. Although Plaintiffs may claim to be "original-content news publishers[,]" *id.* ¶181, this does not mean that every injury they have allegedly suffered in any aspect of their many businesses derives from harm to competition in the market for online news.[5]  Further, the harms they describe to their own enterprises are the types of harms to the welfare of individual competitors that courts do not consider sufficient to state antitrust injuries. *Ginzburg.*, 993 F. Supp. at 1015.

At bottom, the injuries claimed by Plaintiffs are not antitrust injuries because they simply do not flow from any alleged restraint on trade in the alleged market for online news.  Plaintiffs

---

[5] Even plaintiffs "whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001).  So even if Plaintiffs' harms did flow from their supposed exclusion from the online news market, harms to their ability to compete in markets for books or chiropractic services would not be sufficient to state antitrust injuries.

make no effort to allege that consumers or advertisers are harmed by any kind of increase in price caused by any reduction in output due to the supposed boycott.  There are no allegations of lost revenue from reader subscriptions (in fact, there could be none as no Plaintiff charges for content) or lost revenue from advertising placed in a news publication.  *See Norris*, 500 F.3d at 466.[6]

To the extent that Plaintiffs claim that Defendants' conduct harms the free exchange of ideas, rather than products or services that are traded in a commercial marketplace, Plaintiffs do not allege a cognizable antitrust injury.  *See DataCell Ehf v. Visa, Inc.*, No. 1:14–CV–1658 GBL/TCB, 2015 WL 4624714, at *9 (E.D. Va. July 30, 2015) ("Congress created antitrust laws to protect free market competition, not to protect the free exchange of ideas.").  Indeed, antitrust laws are economic in their purpose and do not reach injuries allegedly suffered in the "marketplace of ideas."  *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 983 (D.C. Cir. 2017) ("[A]ntitrust laws protect market (*i.e.* economic) competition."); *see also Adams v. Am. Bar Assoc.*, 400 F. Supp. 219, 223 (E.D. Pa. 1975) ("The antitrust laws . . . clearly do not reach conduct which the plaintiffs perceive as a monopoly of 'free trade in ideas.'").

In *DataCell*, a case presenting issues similar to those here, the court dismissed DataCell's antitrust claim on standing grounds because it failed to allege a cognizable antitrust injury.  2015 WL 4624714, at *7.  After WikiLeaks released documents classified by the U.S. government, Visa and MasterCard halted payments to and through DataCell because it operated WikiLeaks' credit card system.  *Id.* at *1-2.  DataCell alleged that Visa and MasterCard violated antitrust laws by "injur[ing] the media market by suppressing the marketplace of ideas."  *Id.* at *6.  DataCell also

---

[6] Plaintiff Ms. Finn alleges lost social media ad revenues but these alleged losses are linked to her social media presence and are not lost advertising in a news publication.  ECF No. 1 ¶¶67, 392.  Additionally, Plaintiff TSN alleges it has lost ad revenue, yet its website says it is financed solely by its founder.  *Id.* ¶368; *see also* TrialSite News, *About Us*, https://www.trialsitenews.com/about-us (last visited Feb. 21, 2023).

alleged it was harmed by having to forgo a percentage of donations it would have received.  *Id.*
The court dismissed DataCell's claims, finding that there were no facts suggesting the media
market experienced any impact.  *Id.* *7.  The court further explained that "[i]f the products in
DataCell's market are ideas, then the antitrust laws cannot help DataCell."  *Id.*

Plaintiffs' allegations that Defendants caused injury to "competition in the marketplace of
ideas[,]" ECF No. 1 at ¶37, are similar to the claim made by DataCell.  They allege that, by making
efforts to combat the spread of harmful disinformation, TNI members were "suppressing
competition in the marketplace of ideas[.]"  *Id.* ¶310.  This is not a fair characterization of
Defendants' conduct, but it is in any event irrelevant to Plaintiffs' antitrust claims.  Because alleged
harms to the free expression of viewpoints, like ideas, fall outside of the purview of antitrust laws,
Plaintiffs "cannot fit [their] grievances into the framework of the Sherman Act."  *DataCell*, 2015
WL 4624714, at *7.  The alleged censorship Plaintiffs purportedly suffered is not antitrust injury.[7]

Moreover, lost donations cannot constitute antitrust injury for a simple reason—they are
not trade or commerce, and the Sherman Act applies only to activity involving trade or commerce.
*See Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S.*, 50 F.3d 710, 712 (9th
Cir. 1995) (explaining that the Sherman Act does not apply to a plaintiff's claim that it "lost
donations in excess of $100 million," because "the solicitation of contributions by a nonprofit
organization is not trade or commerce, and the Sherman Act has no application to such an

---

[7]  Plaintiffs argue that the antitrust laws protect the free exchange of ideas, but, in so doing, they
rely entirely on a single case: *Associated Press v. United States*, 326 U.S. 1 (1945).  The Court in
that case was determining, not whether the antitrust laws protect the free exchange of ideas, but
whether news publishers could use the protection of the First Amendment as a shelter against
antitrust liability.  *Id.* at 19-20.  Plaintiffs cite extensively to Justice Frankfurter's concurrence
which is not binding.  ECF No. 1 at ¶¶29-34, 304.  Moreover, the language cited by Plaintiffs
discusses the purpose of the First Amendment – not the purpose of antitrust law.  *Id.* ¶¶26, 305,
537.

activity.").  As the court in that case opined, "[i]f self-serving activity is necessarily commercial, the Sherman Act embraces everything from a church fair to the solicitation of voluntary blood donors."  *Id.* at 714.

### 2.    Plaintiffs Do Not Have Antitrust Standing Because Their Alleged Injuries Cannot Be Linked to The AP's Conduct

In addition to their failure to allege that they have suffered antitrust injuries, Plaintiffs also lack antitrust standing because they cannot show that they are proper plaintiffs.  Their claimed injuries are too far attenuated from any of Defendants' alleged conduct to support their standing to make antitrust claims.  Antitrust standing requires "proper plaintiff status, which assures that other parties are not better situated to bring suit."  *Doctor's Hosp.*, 123 F.3d at 305.  This inquiry focuses on proximate causation.  Courts consider the following factors: "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment."  *McCormack v. Nat'l Collegiate Athletic Assoc.*, 845 F.2d 1338, 1341 (5th Cir. 1988).

Here, for all of the reasons discussed *supra* at IV.A, Plaintiffs have alleged they suffered monetary losses due to their content or accounts being removed from various online platforms on various occasions, but they do not make plausible factual allegations linking these actions by technology companies to TNI.  Plaintiffs have not made any plausible allegations that the actions taken against them by these platforms were caused by TNI rather than by the independent actions of technology companies, which in many instances are alleged to have been following their own rules or standards.  Accordingly, the Court should dismiss Plaintiffs' claims for lack of antitrust standing.

### C.       Plaintiffs Fail to Allege a *Per Se* Group Boycott Claim

For the multiple reasons set forth above, Plaintiffs lack standing.  But even if the Court were to hold otherwise, Plaintiffs have failed to allege a group boycott claim under Section 1 of the Sherman Act.  The Supreme Court has explained that "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor[.]"  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  According to the Fifth Circuit, "the touchstone of *per se* illegality is that the customers or suppliers of the plaintiff had, as a group, agreed or been forced to ***cease doing business*** with the plaintiff."  *Consol. Metal Prods*, 846 F.2d at 291 (emphasis added); *see Nw. Wholesale Stationers*, 472 U.S. at 294 (identifying typical characteristics of *per se* illegal group boycott as "cut[ing] off access to a supply, facility, or market necessary to enable the boycotted firm to compete . . . and frequently the boycotting firms possess[] a dominant position in the relevant market").  Plaintiffs' claim lacks this touchstone.  No Plaintiff alleges that all or even most of TNI's technology company members have ceased doing business with them as a result of the alleged group boycott.  Rather, they allege that, from time to time, some of their online news articles have been removed, they have lost the ability to monetize their content, or they have had their accounts suspended or removed from certain platforms.  *See generally* ECF No. 1 at ¶¶356-464.

In determining whether a horizontal group boycott claim merits *per se* treatment, courts in the Fifth Circuit consider three factors derived from *Nw. Wholesale Stationers*, known as the *Tunica* factors: "(1) whether the [boycotting firms] hold a dominant position in the relevant market; (2) whether the [boycotting firms] control access to an element necessary to enable [Plaintiffs] to compete; and (3) whether there exist plausible arguments concerning pro-competitive effects."  *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 414-

15 (5th Cir. 2007); *see United Biologics, LLC v. Allergy & Asthma Network*, Case No. 5:14-35, 2019 WL 830967, at *4-5 (W.D. Tex. Feb. 21, 2019) (analyzing *Tunica* factors to find that Plaintiffs failed to state a *per se* horizontal group boycott claim).[8]   Although an alleged group boycott need not necessarily possess all of these traits to merit *per se* treatment, as demonstrated below, Plaintiffs fail to plausibly allege facts establishing that the so-called group boycott satisfies the first two *Tunica* factors.   The Court should therefore dismiss the *per se* group boycott claim.

### 1.   Plaintiffs Fail to Allege That TNI Members Have a Dominant Position in The Supposed Market for Online News

Plaintiffs fail to allege that the members of the TNI have a dominant position as competitors in the so-called market for online news.   The first factor courts consider is whether "the boycotting firms possessed a dominant position in the relevant market."   *Nw. Wholesale Stationers,* 472 U.S. at 294; *see also Tunica*, 496 F.3d at 413.   Indeed, the Supreme Court has recognized that usually in a *per se* case the boycotting firms have "market power" in the relevant market.   *Ind. Fed'n of Dentists*, 476 U.S. at 458.   Here, Plaintiffs fail to allege that the TNI members (even the unnamed publisher and technology platform members) possess such a dominant position as competitors in the alleged market for online news.

Despite arguing  that they are not required to do so for their group boycott claims, Plaintiffs go to great pains to attempt to define the relevant market as "the US online news market[.]"   ECF No. 1 at ¶130.   According to Plaintiffs, the term "news" in the market definition refers to "information about current events, information of current interest to the public, and information

---

[8]   Although the Fifth Circuit subsequently held in *MM Steel, L.P. v. JSW Steel USA Inc.*, that a district court did not err in not instructing a jury to consider the *Tunica* factors before applying *per se* liability to a group boycott claim, that case concerned whether vertical members of an alleged group boycott among horizontal competitors could also be considered *per se* liable.  806 F.3d 835, 850 (5th Cir. 2015).   Importantly, the *MM Steel* court noted that "each of these [*Tunica*] factors would likely be met" by the alleged boycott.   *Id.* at 850 n.8.

that helps citizens in a free society govern themselves" as well as "analysis of and opinion on such information."  *Id.* ¶¶136-37.[9]   As defined by Plaintiffs, this alleged market of online news is exceptionally broad, covering many types of information being disseminated online by virtually anyone with Internet access through a multitude of platforms.  Plaintiffs allege that TNI's members compete with Plaintiffs in the online news market.  *Id.* ¶¶177-215.

Glaringly absent is any plausible allegation that the TNI members have a dominant position as competitors in the market for online news as they have defined it.  As Plaintiffs acknowledge, there has been "an explosion of new entrants into the news market" through online news publishing, including an "increasing number of non-professional sources such as bloggers and citizen journalists."  *Id.* ¶¶157, 167.  There are "dramatically lower production costs, lower barriers to entry, and far lower distribution costs[.]"  *Id*. ¶157.  Competitors in the proposed market thus number in the thousands (or more) and include anyone who publishes various types of information, analyses, and opinions online on any platform, whether their own blogs and websites, platforms owned by TNI members, or platforms owned by other technology companies.  TNI includes a number of large news publishers, but there are many other large news publishers that are not members of TNI.[10]  Plaintiffs do not and cannot allege that this group of a dozen or so online news publishers, *see id.* ¶297, have a dominant position in the expansive online news market they have proposed.  *See Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 690 (9th Cir. 2022) ("[T]he complaint does not plausibly allege that the HFPA—a group of 85 entertainment journalists, only

---

[9]  Plaintiffs also attempt to define separate submarkets for "news concerning COVID-19" and "news concerning politics, politicians, government policy, and elections."  *Id.* ¶¶140-45.

[10] Many large news publishers and aggregators like CNN and Apple, for instance, are not alleged to be members of TNI. *See id.* ¶297.

half of whom are 'active journalists'—possesses market power in any reasonably defined market.")  TNI members represent only a small subset of online news publishers.

Plaintiffs try to avoid this defect in their claim by focusing on TNI's technology company members – not as competitors in the online news market, but in their roles at a completely different level of the market.  Plaintiffs argue TNI has a dominant position in the online news market because the technology platform members are market gatekeepers who host third-party news content.  *Id.* ¶¶219, 227.  This conflates the first two *Tunica* factors.  Although this allegation may have some relevance to the second *Tunica* factor, discussed *infra*, it does not bear on the first— the position of the TNI members, including technology platform members, as competitors in the market for online news.  Plaintiffs also allege that TNI technology company members have market power in a series of undefined markets, including the social network market, the online long-form video market, the English-speaking microblogging market, and the search engine market, that are not relevant to the online news market.  *Id.* ¶¶499-504.  These allegations only emphasize that Plaintiffs have not, and cannot, make such allegations about the share of TNI members in the market for online news.

### 2. Plaintiffs Fail to Allege That TNI Members Cut off Plaintiffs' Access to Any Facility Necessary to Compete

The second factor courts consider in determining whether to apply the *per se* treatment is whether the alleged boycott "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete[.]"  *Nw. Wholesale Stationers,* 472 U.S. at 294; *see also Tunica*, 496 F.3d at 413.  Plaintiffs fail to plausibly allege that the TNI members' alleged boycott cut them off from any such facility.  To the contrary, they have undeniably continued to compete in the online news market through a variety of different channels and platforms, including those owned by TNI members.

Plaintiffs cannot plausibly allege that access to the technology platforms owned by TNI technology company members were necessary for them to compete in the online news market. To the contrary, Plaintiffs tout that "[o]nline news publishing enjoys dramatically lower production costs, lower barriers to entry, and far lower distribution costs" than traditional news media. ECF No. 1 at ¶157. In fact, news can be disseminated online by virtually anyone with Internet access. Almost all of the Plaintiffs run their own websites on which they publish news, including CHD and its founder Mr. Kennedy, *id.* ¶39, TSN, *id.* ¶41, CD Media, *id.* ¶56, Ms. Finn, *id.* ¶60, Mr. Swann, *id.* ¶86, Mr. and Mrs. Bollinger, *id.* ¶95, and Dr. Joseph Mercola, *id.* ¶102. Mr. Hoft even touts that his website is "one of the Internet's ***most popular and important*** conservatively oriented destinations for news and commentary." *Id.* ¶75 (emphasis added). Plaintiffs remain free to publish online news on any number of Internet sites and have it disseminated on various platforms.

Plaintiffs argue that "exclusion from the world's dominant Internet platforms means being shut out of the market[,]" *id.* ¶236, but they have not actually been excluded from Internet platforms by the alleged group boycott or otherwise. As an initial matter, Plaintiffs make no allegation that TNI has acted to exclude them from publishing any content on the online platforms of technology companies who are not TNI members such as Apple, InfoWars, Parler, TikTok, Truth Social, and many others. Turning to technology companies who are TNI members, Plaintiffs fail to allege that there was any agreement by TNI's technology members to ban, boycott, or exclude them from their platforms. This deficiency is crucial as Plaintiffs acknowledge that "TNI's Legacy News Members had to partner with Big Tech" in order to supposedly exclude them from the online news market. *Id.* ¶280. Although Plaintiffs allege that the publisher members of TNI were economically motivated to exclude them from the online news market, *id.* ¶278, they do not allege that the technology platforms had any economic motivation to do so. Nor do they, or

can they, allege that TNI's publisher members had the power to coerce the supposedly dominant technology company members to agree to their supposed group boycott scheme.  In fact, they allege the opposite—that the platforms have bargaining power over the publishers and can and do dictate their own business terms.  *Id.* ¶¶231-233. The Complaint is thus missing what should be the heart of Plaintiffs' claims—there are no plausible factual allegations of any agreement by TNI's technology company members to exclude Plaintiffs from any Internet platform.[11]  Although the Complaint alleges that there were clear expectations as to how the technology company members of TNI would act, including excluding or censoring content of publishers, *id.* ¶289, the Complaint lacks any allegations supporting the conclusory assertion that these supposedly dominant technology companies would agree to exclude certain online news publishers at the behest of the publisher TNI members.

The lack of any agreement by TNI's technology company members to exclude Plaintiffs from their platforms is demonstrated by the fact that Plaintiffs allege a smattering of actions at different times by platforms owned by TNI's technology company members.  This failure to allege that the technology company members of TNI actually agreed to exclude Plaintiffs from their platforms demonstrates that the group boycott claim does not merit *per se* treatment.  *See Consol. Metal Prods.*, 846 F.2d at 291 ("In the various cases discussed in *Northwest Wholesale Stationers* … the touchstone of *per se* illegality is that the customers or suppliers of the plaintiff had, as a group, agreed or been forced to cease doing business with the plaintiff."); *see also United Biologics, LLC v. Allergy & Asthma Network*, No. 5:14-35, 2019 WL 830967, at *4 (W.D. Tex. Feb. 21, 2019) ("Moreover, the record does not indicate [the alleged boycotting firms] jointly

---

[11]  Plaintiffs appear to be aware of this defect in their claims as they have not named a single technology company member of TNI as a defendant in this case, despite directing the crux of their allegations to the alleged conduct of the technology companies.

refused to deal. [One alleged boycotter] continued providing equipment to labs servicing [the alleged targets of the boycott]").  Plaintiffs allege that various technology companies took different actions against them at different times, including, for example, Twitter restricting CHD's account for twenty-four hours, *id.* ¶358, YouTube removing a TSN video and restoring it after appeal, *id.* ¶366, LinkedIn disabling CD Media's account for violating LinkedIn's user agreement, *id.* ¶373, Facebook reducing distribution of CD Media posts, *id.* ¶376, and Instagram removing followers from Ms. Finn's personal product page, *id.* ¶390.  But, no Plaintiff alleges that they have been excluded from all of the platforms owned by TNI's technology company members at any time. Plaintiffs have not been denied access to any facility necessary to compete in the alleged online news market.

### D.    Plaintiffs Fail to Allege The Conduct of TNI Members Had Any Anti-Competitive Effects in The Supposed Online News Market

Plaintiffs claim that the alleged group boycott violates the rule of reason fares no better than their *per se* claim because they cannot plausibly allege that the supposed group boycott had an anti-competitive effect in any relevant market.  To state a Section 1 violation under the rule of reason analysis, Plaintiffs must plausibly allege that Defendants' activities caused an injury to competition.  *See Doctor's Hosp.,* 123 F.3d at 307 (stating the requirements to prove a Sherman Act Section 1 claim under the rule of reason).  More specifically, "the rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market – a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Consol. Metal Prods.*, 846 F.2d at 293-94.  To state a rule of reason claim, Plaintiffs must allege "a substantial anticompetitive effect that harms consumers [in the online news market]."  *Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. SA-17-CA-1122, 2022 WL 18076843, at *21 (W.D. Tex. July 14, 2022) (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274,

2284 (2018)).  Plaintiffs' claim that the alleged group boycott violates the rule of reason should be

dismissed due to their failure to plausibly allege any anticompetitive effect in the online news

market, let alone a substantial one.

Most of Plaintiffs' allegations of anti-competitive effects in the market for online news boil

down either to complaints about harms they believe they have suffered or bare allegations about

unknown other online news publishers.  Plaintiffs have broadly defined the supposed market for

online news as covering various types of information being disseminated online by virtually

anyone with Internet access through a multitude of platforms.  ECF No. 1 ¶130.  Putting aside for

the moment whether this online news market is properly defined, and it is not,[12] Plaintiffs have

failed to show that Defendants' action had any anticompetitive effect in such a vast and amorphous

market.  Plaintiffs first claim that output of online news has been reduced because their content

and/or accounts have been removed from online platforms.  *Id.* ¶535.  This is plainly insufficient

because "a showing that the defendants harmed the plaintiffs is not enough to prove a violation of

section 1 under the rule of reason."  *Consol. Metal Prods.*, 846 F.2d at 293-94; *see also Viazis v.*

*Am. Ass'n of Orthodontists*, 182 F. Supp. 2d 552, 569 (E.D. Tex. 2001) ("[T]he required showing

under the Rule of Reason does not concern itself with effects on a particular plaintiff, but, rather

---

[12]   Indeed, Plaintiffs attempt to limit the geographic market to the United States, but there are several allegations suggesting that at least the United Kingdom must also be included in the relevant market.  *See EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*, 2019 WL 3503240, at *17 (N.D. Tex. Aug. 1, 2019) ("Plaintiff incomprehensibly limits the geographic market to the United States. . . . Plaintiff's own allegations suggest that the geographic market is broader than this: the Complaint states that Defendants' customers and competitors are located in the United States and Canada.").  As in *EuroTec*, Plaintiffs' rely on characterizations of statements made by BBC representatives.  *See* ECF No. 1 at ¶¶19, 189, 195, 254-97.  The BBC, however, is "the national broadcasting service of the United Kingdom" and has "a principal place of business in London."  *Id.* ¶112.  It certainly cannot be said that BBC's customers for online news are limited to the United States.  Another alleged member of TNI is the European Broadcasting Union.  *Id.* ¶297.

with effects on the relevant market as a whole.")  Then, Plaintiffs claim that other online news publishers may have been dissuaded from publishing due to the actions of the TNI.  ECF No. 1 ¶535.  But, the online news market as defined by Plaintiffs likely includes thousands of competitors and Plaintiffs concede that through Internet platforms there has been "an explosion of new entrants into the news market."  *Id.* ¶157.  A few unknown online news publishers deciding not to contribute cannot plausibly have a substantial effect on such an outsized market.  There are no allegations that the information that Plaintiffs cite about COVID, vaccines, and elections is not readily available on the Internet.  Indeed, Plaintiffs have cited such articles extensively.  *Id.* ¶306.

Nor do Plaintiffs even attempt to show that prices for online news—either paid by subscribers or advertisers—have increased or even were stabilized due to the alleged boycott.  The lack of such an allegation is especially telling, as one would expect any supported allegation about a reduction in output supposedly to preserve traditional publishers to be accompanied by such allegations.

Plaintiffs instead make allegations relating to freedom of speech rather than economic harm, which are not anti-competitive effects.  Specifically, Plaintiffs allege that TNI members reduced consumer welfare by stifling ideas.  *Id.* ¶¶536-37.  These allegations have no bearing on economic competition.  Tellingly, Plaintiffs make no allegations about prices increasing or any other concrete economic impact on consumers or on competition in the online news market.  The Court should accordingly dismiss Plaintiffs' rule of reason group boycott claim.

## V.    CONCLUSION

For all the reasons discussed above, the Court should grant The AP's motion, dismiss Plaintiffs' Complaint with prejudice, and grant The AP such other and further relief as the Court deems just and proper.

Respectfully submitted,
*/s/ Timothy Williams*
Timothy Williams (Tex. Bar ID 24067940)
Tim.williams@sprouselaw.com
Sprouse Shrader Smith PLLC
701 S. Taylor, Suite 500
Amarillo, TX 79101
T: 806.468.3346
F: 806.373.3454

Leslie E. John (*pro hac vice* forthcoming)
john@ballardspahr.com
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Phone: 215-665-8500

*Attorneys for Defendant The Associated Press*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on February 21, 2023, notice of the foregoing document was provided via the CM/ECF system to all counsel of record.  In addition, notice was provided via e-mail to the counsel named below.

/s/ *Timothy Williams*
Timothy Williams

Ryan Patrick Brown
ryan@ryanbrownattorneyatlaw.com
RYAN BROWN ATTORNEY AT LAW
1222 S. Fillmore Street
Amarillo, Texas 79101
Tel: (806) 372-5711

John W. Howard
johnh@jwhowardattorneys.com
JW HOWARD ATTORNEYS
600 West Broadway, Suite 1400
San Diego, California 92101
Tel: (619) 234-2842

Scott J. Street
sstreet@jwhowardattorneys.com
JW HOWARD ATTORNEYS
201 South Lake Avenue, Suite 303
Pasadena, California 91101
Tel: (213) 205-2800

Jed Rubenfeld
rubenfeldjed@gmail.com
Roger Teich
rteich@juno.com

*Attorneys for Plaintiffs*

Thomas C. Riney
Tom.riney@uwlaw.com
C. Jason Fenton
Jason.fenton@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
500 S. Taylor, Suite 1200
Amarillo, Texas 79101
Tel: (806) 379-5613; Fax: (806) 379-0316

John E. Schmidtlein
jschmidtlein@wc.com
Thomas G. Hentoff
thentoff@wc.com
Nicholas G. Gamse
ngamse@wc.com
Kathryn E. Garza
kgarza@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Tel: (202) 434-5000; Fax: (202) 434-5029

*Attorneys for WP Company LLC d/b/a The Washington Post*

Michelle A. Mantine
mmantine@reedsmith.com
Edward B. Schwartz
eschwartz@reedsmith.com
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222
Tel: (215) 665-8500; Fax (215) 864-8999

*Attorneys for The British Broadcasting Corp.*

David M. Russell
david@srlawtx.com
SMITHEE & RUSSELL, LLP
320 S. Polk Street, Suite 920
Amarillo, Texas 79101
Tel: (806) 322-9200; Fax: (806) 322-9201

Justina Sessions
jsessions@wsgr.com
WILSON SONSINI GOODICH & ROSATI
One Market Plaza, Spear Tower, Suite 330
San Francisco, California 94105
Tel: (415) 947-2000

*Attorneys for Reuters News & Media Incorp.*