**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| CHILDREN'S HEALTH DEFENSE, | ) | |
| ROBERT F. KENNEDY, JR., TRIALSITE, | ) | |
| INC., CREATIVE DESTRUCTION | ) | |
| MEDIA, LLC, ERIN ELIZABETH FINN, | ) | |
| JIM HOFT, DR. BEN TAPPER, BEN | ) | |
| SWANN, DR. JOSEPH MERCOLA, TY | ) | |
| BOLLINGER & CHARLENE | ) | |
| BOLLINGER, | ) | |
| | ) | |
| *Plaintiffs,* | ) | Civil Action No. 2:23-cv-00004-Z |
| v. | ) | |
| | ) | |
| WP COMPANY LLC D/B/A THE | ) | |
| WASHINGTON POST, THE BRITISH | ) | |
| BROADCASTING CORP., THE | ) | |
| ASSOCIATED PRESS, & REUTERS, | ) | |
| | ) | |
| *Defendants*. | | |

**BRIEF IN SUPPORT OF THE ASSOCIATED PRESS, REUTERS
NEWS & MEDIA INC., AND WP COMPANY LLC'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

          A.    Plaintiffs ............................................................................................ 3

          B.    The Trusted News Initiative ............................................................ 5

          C.    This Lawsuit .................................................................................... 6

ARGUMENT .............................................................................................................. 6

I.       THE COMPLAINT FAILS TO PLAUSIBLY PLEAD A CONSPIRACY
       TO ACHIEVE AN UNLAWFUL OBJECTIVE. ......................................... 7

II.     THE COMPLAINT FAILS TO PLEAD A PLAUSIBLE
       UNREASONABLE RESTRAINT OF TRADE. ......................................... 12

          A.    The Complaint Fails To Plead the Elements of a *Per Se* Group
               Boycott. .......................................................................................... 13

               1.    The Complaint Fails To Allege TNI Members Have a
                    Dominant Position in a Defined, Relevant Market. ........... 14

               2.    The Complaint Fails To Allege TNI Members Cut Off
                    Plaintiffs' Access to Any Facility Necessary To Compete,
                    or That Plaintiffs Were Foreclosed from a Relevant
                    Market. ................................................................................. 17

               3.    The Complaint Fails To Allege Facts Demonstrating That
                    the TNI Lacked Any Plausible Procompetitive
                    Justifications. ...................................................................... 19

          B.    The Complaint Fails To Plead a Rule of Reason Violation. ........... 20

III.   THE COMPLAINT FAILS TO PLEAD PLAUSIBLE ANTITRUST
       INJURY. ..................................................................................................... 21

          A.    The Complaint Fails To Plead That Plaintiffs Suffered Antitrust
               Injuries. .......................................................................................... 22

          B.    The Complaint Fails To Plausibly Plead Injury to Competition. ... 23

IV.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTIONABLE
       CONDUCT BY EACH OF THE DEFENDANTS. .................................... 24

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, No. 5:17-CV-1295-RCL, 2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ...................................................20

*Adams v. Am. Bar Ass'n.*, 400 F. Supp. 219 (E.D. Pa. 1975) ..........................................................22

*Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ...........................................................................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................................6

*Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) ................................................ *passim*

*Boyd v. Canadian Indep. Sch. Dist.*, No. 2:21-CV-95-Z-BR, 2022 WL 837933 (N.D. Tex. Feb. 17, 2022), *report and recommendation adopted*, No. 2:21-CV-95-Z-BR, 2022 WL 837195 (N.D. Tex. Mar. 21, 2022) ............................................................................15, 18

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 463 F. Supp. 3d 578 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) ....................................................................................7

*Brooks v. United Dev. Funding III, L.P.*, No. 4:20-cv-00150-O, 2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ................................................................................................................11

*Broyles v. Wilson*, 3 F.3d 439 (5th Cir. 1993), 1993 WL 347222 ...................................................9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................................22

*Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S., Inc.*, 50 F.3d 710 (9th Cir. 1995) ..............................................................................................................................22

*EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240 (N.D. Tex. Aug. 1, 2019) .......................................................9, 24

*Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777 (5th Cir. 2015) .....................................4, 5

*Fisher v. City of Berkeley*, 475 U.S. 260 (1986) ............................................................................7

*Flaa v. Hollywood Foreign Press Ass'n.*, 55 F.4th 680 (9th Cir. 2022) ........................................16

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986) .....................................................................14

*Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998 (S.D. Tex. 1997) ....................................24

*Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266 (5th Cir. 2008) ........................9, 10, 11

*Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir. 2001) ........................................................23

*In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017 (N.D. Cal. 2021) ...............19

*Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697 (D. Minn. 2011) .....18, 19

*Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ......................22, 23

*Lake Eugenie Land & Dev., Inc. v. Halliburton Energy Servs. Inc. (In re Deepwater Horizon)*, 934 F.3d 434 (5th Cir. 2019) ...................................................................................4

*Lifeway Foods, Inc. v. Millenium Prods., Inc.*, No. CV 16-7099-R, 2016 WL 7336721 (C.D. Cal. Dec. 14, 2016) ...........................................................................................................15

*Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398 (S.D.N.Y. 2021).......................................8, 9

*Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014)........................................... *passim*

*Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 853 F. Supp. 837 (E.D. Pa. 1994), *amended*, 857 F. Supp. 455 (E.D. Pa. 1994), *aff'd*, 107 F.3d 1026 (3d Cir. 1997) ................13

*McCormack v. NCAA*, 845 F.2d 1338 (5th Cir. 1988)................................................................23

*Mercola.Com, LLC v. Google, LLC* 3:22-CV-05567, ECF No. 1 (N.D. Cal. filed Sept. 28, 2022) ..........................................................................................................................................4

*MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835 (5th Cir. 2015).........................................6

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)............................................7, 9, 10

*Norris v. Hearst Tr.*, 500 F.3d 454 (5th Cir. 2007).................................................................22, 23

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985)................................................................................................................12, 13, 17, 19

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 3:21-CV-448-BJD-LLL, 2022 WL 17478298 (M.D. Fla. July 27, 2022) ...............................................................................17

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994)..............................24

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ...............................24, 25

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307 (5th Cir. 2000) ...........................................................................................................................................6

*Taylor v. Christus St. Joseph's Health Sys.*, No. 5:04-CV-153-DF, 2006 WL 1582097 (E.D. Tex. Mar. 28, 2006)..........................................................................................................20

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008) ...................................................................................................................3, 24, 25

*Trudeau v. Google LLC*, 349 F. Supp. 3d 869 (N.D. Cal. 2018), *aff'd*, 816 F. App'x 68
(9th Cir. 2020)......................................................................................................4

*Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403 (5th Cir. 2007) ..........13, 14

*United States ex rel. Jamison v. Career Opportunities, Inc.*, No. 3:16-CV-3248-S, 2020
WL 520590 (N.D. Tex. Jan. 31, 2020) ................................................................5

*Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382 (5th Cir. 2001)..................................13

## STATUTES AND RULES

47 U.S.C. § 230(b)(2) ......................................................................................................19

47 U.S.C. § 230(c)(2).......................................................................................................19

Federal Rule of Civil Procedure 12(b)(6) ......................................................................1

## INTRODUCTION

Plaintiffs are online news publishers who claim to have had content they posted online removed or unfavorably treated by Internet platforms such as Facebook, Instagram, LinkedIn, Twitter, and YouTube (the "Platforms").  *See* Am. Compl. ("Complaint" or "AC") ¶ 11.  Tellingly, none of those Platforms—each of which has its own policies about how it moderates content—is named as a defendant here.

Instead, with this antitrust lawsuit, Plaintiffs have wrongly targeted four news organizations that do not own, operate or control any of the Platforms: The Associated Press ("The AP"), the British Broadcasting Company ("the BBC"), Reuters News & Media Incorporated ("Reuters"), and WP Company LLC d/b/a The Washington Post ("the Post") (collectively, "Defendants").  The Complaint alleges that Defendants, along with other news organizations and a few technology companies operating the Platforms, participated in an industry information-sharing partnership called the Trusted News Initiative ("TNI"), that was aimed at identifying harmful disinformation.  *See* AC ¶¶ 3–5.  The Complaint further alleges that this initiative constituted a "group boycott" of "smaller online news publishers who engage in Prohibited Reporting," in violation of Section 1 of the Sherman Act.  *Id.* ¶¶ 6, 302.  For four independently dispositive reasons, the Complaint fails to plausibly allege an antitrust violation and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

First, the Complaint fails to plausibly allege that the Platforms *agreed* with the Defendants that the Platforms would take action against the Plaintiffs or anyone else.  As the Supreme Court explained in *Bell Atlantic Corporation v. Twombly*, a claim under Section 1 of the Sherman Act must have "enough factual matter (taken as true) to suggest that *an agreement was made*."  550 U.S. 544, 556–57 (2007) (emphasis added); *see also id.* ("[P]arallel conduct does not suggest conspiracy.").  But rather than give rise to the plausible inference of a conspiracy to ban Plaintiffs

from the Platforms, Plaintiffs' allegations instead reflect nothing more than the Platforms taking independent action consistent with their own content moderation policies. At most, the Complaint speculates that some Defendants *flagged* certain unidentified content as problematic. But that suggestion is insufficient to plausibly allege an *agreement* to achieve an unlawful purpose, particularly in the absence of allegations that any Defendant flagged content posted by Plaintiffs, or that any Platform agreed to take action as a result. Plaintiffs cannot plausibly allege a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 375–76 (5th Cir. 2014).

Second, the Complaint fails to allege facts showing that the TNI unreasonably restrained trade in any properly defined relevant antitrust market. The "marketplace of ideas" from which Plaintiffs feel excluded is not an antitrust market that the antitrust laws reach. In any case, Plaintiffs cannot make out a *per se* violation of the Sherman Act (Count 1) because they do not plausibly allege that Defendants had a dominant position in the expansive market for online news or that Plaintiffs have been excluded from that market. Nor can they show that the alleged restraint violated the rule of reason (Count 2). As in *Marucci*, Plaintiffs "allege[] no factual information about other competitors dropping out of the market, significant price changes, or diminution in . . . quality." *Id.* at 377. Thus, the TNI's alleged "anticompetitive evils, pursuant to the information in the . . . Complaint, are virtually non-existent." *Id.* (affirming dismissal).

Third, the Complaint fails to plead antitrust injury. It does not assert that Plaintiffs experienced any plausible injury that is directly attributable to Defendants' alleged involvement with the TNI, much less that the alleged injury reduced competition in a relevant antitrust market.

Fourth, the Complaint fails to plead specific action consistent with the alleged conspiracy by any of the four Defendants. The Complaint does not allege facts that any Defendant (as opposed

to the Platforms) took any action against Plaintiffs whatsoever.  Such "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."  *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).

The Complaint should be dismissed in its entirety.[1]

## BACKGROUND

### A.    Plaintiffs

Plaintiffs are eleven individuals and entities that claim they operate as "original-content news publishers" "in the U.S. market for online COVID news."  *See* AC ¶¶ 181–182.  They allege that they frequently published content on social media sites including Facebook, LinkedIn, Twitter, and YouTube, among other channels.  *See id.* ¶¶ 41, 48, 58, 63, 73, 84, 93, 99–100, 108.

Plaintiffs allege that they suffered repercussions because they "published one or more" of a set of "Prohibited Claims," which generally relate to their views about COVID-19, that the Platforms have concluded violate their content moderation policies, including "Claims that COVID-19 vaccines can kill or seriously harm people," "Claims that the COVID vaccines are not effective in preventing infection," and "Claims about the COVID vaccines that contradict 'expert consensus' from U.S. health authorities or the WHO."  *See id.* ¶¶ 306, 356.  They contend that because they published content related to these "Prohibited Claims," they were "censored, de-monetized, demoted, throttled, shadow-banned, and/or excluded entirely from platforms like Facebook, YouTube, Twitter, Instagram and Linked-In."  *Id.* ¶¶ 11, 356 (alleging the ramifications

---

[1] The AP understands that its Motion to Dismiss filed on February 21, 2023 remains operative, but, in an abundance of caution, and to the extent that is not the case, it joins in this Motion in its entirety.  To the extent the prior Motion to Dismiss by The AP remains operative, it hereby seeks leave to join in and adopt the additional arguments made in this Motion in favor of dismissal.

occurred "as a result" of their publication of the Prohibited Claims).  In addition, they either allege or do not dispute that these allegedly adverse actions were taken pursuant to the Platforms' respective content moderation policies.  *See id.* ¶¶ 357–464.[2]  Plaintiffs assert they were damaged by the Platforms' actions because the Platforms are "market gatekeepers with the power to cripple or destroy original-content news publishers by excluding them from their platforms."  *Id.* ¶ 219. However, none of the Platforms are defendants here.

Some of the Plaintiffs have engaged in other litigation related to actions taken by various Internet platforms in response to their views about COVID and COVID-related treatment.  For example, "Dr. Mercola and Mercola.com have filed an action against Google for breach of contract, among other counts" "[b]ased on [the same] de-platforming" described in the Complaint in this case.  *Id.* ¶ 463.[3]  Similarly, Robert F. Kennedy, Jr. and others sued dozens of government entities alleging the federal government waged a "systematic campaign to induce [Facebook, Google, and Twitter] to censor speech."  Compl., *Robert F. Kennedy Jr. v. Joseph R. Biden Jr.*, 3:23-CV-00381, ECF No. 1, ¶ 11 (W.D. La. Mar. 24, 2023).  In that suit, plaintiffs allege that government officials, *i.e.*, not Defendants here, "succeeded in inducing major social-media

---

[2]  For example, Facebook's "Content Demotion Guidelines," which are referenced in the Complaint, *see* AC ¶ 11 n.1, provided that Facebook would "remove misinformation where it is likely to directly contribute to the risk of imminent physical harm . . . [or] is likely to directly contribute to interference with the functioning of political processes and certain highly deceptive manipulated media."  *See* Misinformation: Policy Rationale, Meta Transparency Ctr., https://transparency.fb.com/policies/community-standards/misinformation (last visited Apr. 6, 2023).  On a motion to dismiss, the Court may consider "documents either attached to or incorporated in the complaint." *See Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015); *see also, e.g.*, *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (taking judicial notice of Google's Terms of Service), *aff'd*, 816 F. App'x 68 (9th Cir. 2020).

[3]  *See* Complaint, *Mercola.Com, LLC v. Google, LLC* 3:22-CV-05567, ECF No. 1 (N.D. Cal. filed Sept. 28, 2022).  The Court "may take judicial notice of prior court proceedings as matters of public record."  *Lake Eugenie Land & Dev., Inc. v. Halliburton Energy Servs. Inc. (In re Deepwater Horizon)*, 934 F.3d 434, 440 (5th Cir. 2019) (per curiam).

platforms to censor" a list of 23 "COVID-related claims" that is nearly identical to the list of 24 "Prohibited Claims" in this case. *Compare id.* ¶ 429(A)–(V) *with* AC ¶ 306(A)–(W).

### B.     The Trusted News Initiative

The Complaint alleges that various publishers, including Defendants, other news organizations, and several platforms, started a group called the "Trusted News Initiative," with a goal of collaborating to ensure credibility in news and to combat the spread of disinformation. *See* AC ¶¶ 3, 256–259. The TNI allegedly "developed a shared early warning system to alert partners about disinformation," including disinformation concerning the 2020 presidential election. *Id.* ¶¶ 256–259. The Complaint cites remarks given on a panel by Jessica Cecil, the BBC's Head of Business Management, who explained that the alert system was designed with "a deliberately high bar to be used only rarely," such as in cases of "an immediate threat to life" or "an immediate threat to the integrity of the democratic process." *See* Technology, Inst. for Pub. Pol'y Rsch. Labour Conf., *Democracy and Trust: Creating a More Democratic Online World*, at 12:50–13:05 (Sept. 28, 2021), https://www.youtube.com/watch?v=jH5VXgLj05E, *cited in* and *quoted in part in* AC ¶ 260.[4] Cecil explained that the TNI featured a "clear set of expectations" such that members would "inform[] each other when they came across that extreme disinformation." *Id.*[5] Plaintiffs do not allege that any Defendant identified or shared with other members online news content from

---

[4] Cecil's remarks are excerpted throughout and incorporated into the Complaint. *See, e.g.*, *Ferguson*, 802 F.3d at 780. A transcript of the remarks is attached. Ex. A.

[5] While the Complaint alleges, without quotation, that these expectations included "[t]hat the TNI's Big Tech Members would exclude from their platforms news content identified as prohibited by the TNI or any of its members," AC ¶ 289(b), that misconstrues Cecil's comments. To the contrary, Cecil explained that once informed, the members "decided what to do about it," *i.e.*, commensurate with their own policies. Ex. A; *see United States ex rel. Jamison v. Career Opportunities, Inc.*, No. 3:16-CV-3248-S, 2020 WL 520590, at *6 (N.D. Tex. Jan. 31, 2020) ("If allegations in a complaint are contradicted by documents incorporated into the complaint, the Court need not consider those allegations as true for the purposes of a motion to dismiss.").

any Plaintiff in connection with the TNI.

The TNI allegedly holds meetings and public conferences for participants to discuss their efforts and best practices to combat the spread of harmful disinformation. AC ¶ 260. Plaintiffs do not allege any instance in which a TNI member discussed any Plaintiff at any such meeting.

### C.     This Lawsuit

In January 2023, Plaintiffs filed this lawsuit alleging that the TNI is a group boycott of "rival news publishers" that is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act, AC ¶¶ 465–528 (Count 1), and is also unlawful under the rule of reason, *id.* ¶¶ 529–541 (Count 2). On February 23, the Court issued a joint briefing schedule for response to Plaintiffs' Complaint. ECF No. 24. On March 9, Plaintiffs amended their complaint to replace The Washington Post Company with WP Company LLC d/b/a The Washington Post. ECF No. 39.

## ARGUMENT

At a bare minimum, a Sherman Act Section 1 plaintiff must show that "the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (internal quotation marks omitted). Antitrust plaintiffs must also prove they have suffered an antitrust injury stemming from the complained-of anticompetitive behavior. *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc*., 200 F.3d 307, 312 (5th Cir. 2000).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. "[A] plaintiff's obligation to provide

the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration omitted).

The Complaint should be dismissed because it fails to plausibly allege: (1) a conspiracy; (2) a restraint on trade, under either a *per se* (Count 1) or rule of reason (Count 2) analytical framework; (3) antitrust injury to Plaintiffs; or (4) concerted conduct by any individual Defendant.

## I.   THE COMPLAINT FAILS TO PLAUSIBLY PLEAD A CONSPIRACY TO ACHIEVE AN UNLAWFUL OBJECTIVE.

Plaintiffs are missing a fundamental and necessary component of their antitrust claims: any plausible allegation that Defendants and the Platforms entered into an agreement to take unlawful action against Plaintiffs.  Specifically, the Complaint fails to allege that any Defendant agreed with any Platform that the Platform would take action as a result of TNI alerts.  Plaintiffs' allegations instead are entirely consistent with the Platforms taking independent action consistent with their own content moderation policies.  The claims thus fail at the first step of the Section 1 analysis because they do not sufficiently allege that Defendants adopted a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci*, 751 F.3d at 375–76.

"Independent action is not proscribed" by Section 1 of the Sherman Act. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).  An entity "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Id.* (internal quotation marks and citations omitted).   For purposes of determining a Section 1 violation, the "distinction between unilateral and concerted action is critical." *Fisher v. City of Berkeley*, 475 U.S. 260, 266 (1986).  To survive a motion to dismiss, a claim under Section 1 of the Sherman Act must have "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556–57; *see also id.* ("[P]arallel conduct does not suggest conspiracy."); *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 463 F. Supp. 3d 578, 596 (W.D. La. 2021) ("Absent

any agreement, there is no Section 1 claim, because an anticompetitive agreement is the *sine qua non* of a Section 1 violation." (citation omitted)), *aff'd*, 49 F.4th 520 (5th Cir. 2022).   The complaint must set forth sufficient allegations to establish a "meeting of the minds" as to the alleged unlawful scheme between the alleged co-conspirators.  *Marucci*, 751 F.3d at 376 (citation omitted).   "[C]onclusory allegations that support one of many inferential possibilities" are insufficient.  *Id.*   "An inference of conspiracy will not arise when the alleged conspirators' conduct made perfect business sense, or where there are obvious alternative explanations for the facts alleged."  *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 417 (S.D.N.Y. 2021) (granting motion to dismiss group boycott claim).

Here, the Complaint "does not set forth facts that demonstrate a 'meeting of the minds'" between the alleged group boycott members to take action against any Plaintiff.  *Marucci*, 751 F.3d at 375 (quoting *Twombly*).   None of the factual allegations in the Complaint give rise to a plausible inference that the Platforms agreed with Defendants to abandon their independence or do *anything* (let alone "de-platform" anyone) as a result of alleged TNI alerts.

The Complaint does not allege that Defendants ever asked the Platforms to limit access to the Plaintiffs' content in any way, much less that the Platforms agreed to do so.  Indeed, Plaintiffs acknowledge that the Platforms do not need any agreement with Defendants in order take action against Plaintiffs' content because the Platforms allegedly maintain a "critical gatekeeping ability" in the alleged news market, AC ¶¶ 216–251, and have preexisting policies to address content they deem objectionable.  The Complaint asserts no explanation whatsoever, much less a plausible one, for why the Platforms would ever agree to cede their own unilateral authority to determine whether content violates their own policies (and they did not).

The most Plaintiffs can allege is that TNI members, including Defendants, agreed to *notify* each other of content they considered to be disinformation.  *See, e.g.*, AC ¶¶ 256, 262, 478.  There is no allegation that any Defendant ever did so.  Moreover, as a matter of law, mere notifications are insufficient to establish a group boycott.  As the Supreme Court has emphasized, "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct."  *Monsanto*, 465 U.S. at 763–64 (citations omitted).  Accordingly, multiple courts have held that allegations of sharing complaints within a group are insufficient to establish an anticompetitive group boycott.  For example, in *Broyles v. Wilson*, the Fifth Circuit found that an attorney did not sufficiently plead an agreement because the attorney did not plead "specific facts" to "demonstrate any intention on the part of [the defendants] to join a conspiracy," where he merely alleged that one defendant referred a complaint to the other, which unilaterally decided to take action.  3 F.3d 439 (5th Cir. 1993), 1993 WL 347222, at *4; *see also, e.g.*, *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008) (affirming summary judgment where evidence of complaints "amount[ed] to an exchange of information, followed by parallel conduct when the Appellees (and over 100 other companies) unanimously voted to remove [plaintiff], and it does not refute the likelihood of independent action"); *EuroTec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *15 (N.D. Tex. Aug. 1, 2019) (dismissing price-fixing and group boycott claims where "Plaintiff did not allege facts showing the purported conspiracy" beyond "summarily stat[ing]" that defendants instructed others not to do business with Plaintiff); *Litovich*, 568 F. Supp. 3d at 417, 423 (granting motion to dismiss where "Plaintiff does not name a single Defendant who complained or a single complaint that was made to" the party which had allegedly terminated plaintiff).

Thus, even if, as Plaintiffs suggest, TNI members agreed to *notify* each other of content they considered to be disinformation, this agreement does not in any way give rise to the inference that Defendants and the Platforms "engaged in *concerted action*, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Golden Bridge Tech.*, 547 F.3d at 271 (emphasis added) (quoting *Monsanto*, 465 U.S. at 764). On the contrary, the Complaint is rife with allegations that the non-party Platforms acted independently to remove content that violated their own independently adopted policies. The Complaint cites various statements made by the Platforms about their own independent efforts to fight misinformation, separate and apart from Defendants or the TNI. *See, e.g.*, AC ¶ 478 (A) (joint statement by various platforms discussing their work "together" to combat misinformation, apart from the TNI), (G) (internal Twitter document noting shared research among platforms, again apart from the TNI).

As Plaintiffs acknowledge, the Platforms have independently decided to remove content that violates their respective content moderation policies. *See, e.g.*, *id.* ¶ 11 n.1 (citing Facebook's policy). While Plaintiffs may disagree about whether their content should be deemed violative of those policies, they have not plausibly alleged that the Platforms agreed to remove their content for any reason other than their own independent enforcement decisions. Thus, Plaintiffs' theory is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by [the Platforms' own] perceptions of the market." *Twombly*, 550 U.S. at 554.

Plaintiffs attempt to escape this unavoidable conclusion by speculating, with no factual support, that TNI members "signed up to a clear set of expectations for how to act," and that those expectations included that "TNI's Big Tech Members would exclude from their platforms news content identified as prohibited by the TNI or any of its members." AC ¶¶ 260, 289. Although the Complaint cites as support the September 2021 remarks of BBC official Jessica Cecil, *id.* ¶ 260,

her full comments show that she said no such thing; she simply stated that TNI members had a "clear set of expectations" to "*inform*[] each other when they came across . . . disinformation." Ex. A (emphasis added).  She further explained that once informed, the members then "decided what to do about it," *i.e.*, acted independently.  *Id.*  The allegation of a direct agreement to exclude content from the market is nothing more than Plaintiffs' own conclusory concoction.

Devoid of any direct evidence, the Complaint turns to circumstantial allegations of an unlawful agreement, but these are equally insufficient.  Although the Complaint alleges the Platforms' conduct reflects "strikingly similar" parallel conduct, AC ¶¶ 320, 338, 353, 481, the allegations illustrate that the opposite is true, for two reasons.

First, these allegations cannot support a claim of an unlawful agreement because they are devoid of any action by either the Defendants, or the TNI group, directed at the Plaintiffs.  There is no fact alleged anywhere in the Complaint that any Defendant *ever* flagged a Plaintiff, or that any Platform *ever* acted on such a notification.[6]  Indeed, there is not so much as a plausible allegation that the TNI group even *discussed* Plaintiffs.  The Plaintiffs' inference that the TNI had anything to do with them is not even circumstantial—it is speculation.

Second, while the Complaint includes a supposed timeline of the Platforms' alleged

_____

[6] The only circumstantial allegation involving a Defendant is that Plaintiffs allege that the Post had advance notice regarding YouTube's alleged "de-platforming" of Dr. Mercola's account, because it published an article at "9:00 AM EDT," shortly before YouTube emailed him.  AC ¶¶ 459–462.  But Plaintiffs ignore that at least one other non-TNI publisher reported the news contemporaneously with the Post.  *See* Mark Bergen & Naomi Nix, *YouTube Will Remove Videos with Misinformation About Any Vaccine*, Bloomberg (Sept. 29, 2021 9:00 AM EDT), https://www.bloomberg.com/news/articles/2021-09-29/youtube-will-remove-videos-with-misinformation-about-any-vaccine; *see Brooks v. United Dev. Funding III, L.P.*, No. 4:20-cv-00150-O, 2020 WL 6132230, at *33 (N.D. Tex. Apr. 15, 2020) ("[I]t is generally proper to take judicial notice of articles and Web sites published on the internet" (citation omitted)).  Notably, Bloomberg is *not* alleged to be in the TNI, which proves that Plaintiffs' allegations are consistent with regular market activity, not a conspiracy.  But even if the Post had reported exclusively, such fundamental newsgathering activity would not support a plausible claim of an unlawful agreement.

adverse content moderation across Plaintiffs' various accounts, AC ¶¶ 357–467, these allegations illustrate widely differing approaches taken by the Platforms. The Complaint alleges that while some Platforms removed individual posts, others variously suspended accounts, "shadow-banned" accounts, or "de-platformed" accounts to address offending content. For example, while CHD claims it was de-platformed from YouTube and Facebook (actions taken almost a year apart), *id.* ¶ 358 (J), (L), Twitter only temporarily suspended CHD's account for a few days, *see id.* (F), (G). These varied responses simply underscore that the Platforms were acting independently pursuant to their own judgments and policies. And "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

The Complaint does not plausibly allege that Defendants entered into an unlawful group boycott agreement against Plaintiffs, so the case should be dismissed. *Marucci*, 751 F.3d at 376.

## II.   THE COMPLAINT FAILS TO PLEAD A PLAUSIBLE UNREASONABLE RESTRAINT OF TRADE.

To survive dismissal, the Complaint must also allege facts plausibly showing that the TNI unreasonably restrained trade. *Marucci*, 751 F.3d at 374 (citing *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010)). "Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Id.* (citation omitted). Plaintiffs' claims cannot satisfy either test.

The *per se* rule is applied when "conduct [is] so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand." *Id.* (alteration in original) (citation omitted). The Supreme Court constricted the category of group boycotts that warrant *per se* treatment in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery*

& *Printing Co.*, 472 U.S. 284 (1985).  The Court observed that, while courts must analyze the vast majority of purported "group boycotts" under the rule of reason, a small minority of "group boycott" cases could qualify for *per se* treatment to the extent the purported boycott:  (1) involved boycotting firms that "possess[] a dominant position in the relevant market"; (2) "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"; and (3) involved "practices [that] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive."  *Id.* at 294 (citation omitted); *see, e.g.*, *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 414–15 (5th Cir. 2007) (requiring district court to consider these three factors on remand).

A Plaintiff who fails to make a *per se* showing must instead demonstrate that the alleged restrictive practice imposes a substantial, unreasonable restraint on competition under the rule of reason test.  *Marucci*, 751 F.3d at 374.  "The rule of reason is designed to help courts differentiate between 'restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'"  *Id.* (citation omitted).

The Complaint fails to assert a plausible claim under either standard.

## A.    The Complaint Fails To Plead the Elements of a *Per Se* Group Boycott.

The Complaint's attempt to invoke the small category of *per se* unlawful group boycotts fails at each step of the *per se* test.  Calling this a "*per se* unlawful group boycott," AC ¶ 7, does not make it so.  *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) ("While it is true that [the] complaint faithfully recites the . . . standard, it is equally true that it does no more than that."); *Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 853 F. Supp. 837, 840 (E.D. Pa. 1994) ("[M]erely naming the practice a 'boycott'—and thus calling it a *per se* unlawful restraint—does not make it so."), *amended*, 857 F. Supp. 455 (E.D. Pa. 1994), *aff'd*, 107 F.3d 1026 (3d Cir. 1997).

1.    **The Complaint Fails To Allege TNI Members Have a Dominant Position in a Defined, Relevant Market.**

Plaintiffs' *per se* claim is insufficient from the start as Plaintiffs fail to plausibly allege that TNI members have a dominant position in their claimed market for "US online news."

Plaintiffs attempt to define the "relevant market" as the "US online news market."   AC ¶ 130.  But the Complaint's allegations make plain that the alleged market is extremely broad (if not limitless), featuring content published by virtually anyone with Internet access through a multitude of platforms, ranging from private social media users, to individual websites, to major news organizations like Defendants, to the Platforms themselves.  *See, e.g.*, *id.* ¶¶ 131–171, 200. And the Complaint alleges that both Defendants and the Platforms compete with Plaintiffs in the market for online news.  *Id.* ¶¶ 177–215.

However, the Complaint fails to plausibly establish that TNI members have the requisite "dominant" positions in the relevant market.[7]  "[T]he *per se* approach has generally been limited to cases in which firms with market power [at the same level of distribution] boycott suppliers or customers in order to discourage them from doing business with a competitor."  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *Tunica Web Advert.*, 496 F.3d at 414 (directing district court to assess "whether the casinos hold a dominant position in the relevant market").  Based on the Complaint's own allegations, it is implausible that the TNI members maintain any kind of dominance in the broad market for online news.  The Complaint admits the online news market is expansive and that there has been an "explosion online of thousands of new, rival sources of news." AC ¶ 18.  This "explosion of new entrants" has been enabled by "dramatically lower production costs, lower barriers to entry, and far lower distribution costs."  *Id.* ¶ 157.

---

[7] Defendants' arguments apply with equal force to Plaintiffs' alleged sub-markets for "online COVID news," AC ¶ 182, and "online political news," *id.* ¶ 184.

The Complaint's market dominance theory rests on its thesis that "TNI's Big Tech Members possess an overwhelmingly dominant position in the online news market." *Id.* ¶ 227. But Plaintiffs support this claim with statistics purportedly showing that the TNI Platforms have power in *other* unrelated markets, including, for example, the social network market, the online long-form video market, and the search engine market. *Id.* ¶¶ 499–504. These have no bearing on market power in the alleged relevant market for online news. Although Plaintiffs allege that the Platforms participate in the alleged online news market by aggregating others' content, they plead no facts to establish that such aggregation activity makes them "dominant" in that market.

While the Complaint alleges that "several dominant platforms function as intermediaries to news online," AC ¶ 230, the very authorities cited show that multiple of those "dominant platforms" are *not* TNI members, which defeats their theory. For example, the Complaint heavily cites a *Competition in Digital Markets* Congressional report. *Id.* ¶¶ 230–232. But two of the four "Dominant Online Platforms" discussed in the report, Amazon and Apple, are not TNI members. *See* Staff of H. Comm. on the Judiciary, 117th Cong., Investigation of Competition in Digital Markets 247–29 (Amazon), 330–73 (Apple) (2020).[8] For instance, the Complaint quotes the report's assertion that "dominant firms can impose unilateral terms on publishers," but ignores that

---

[8] Numerous other platforms that Plaintiffs themselves use, such as Gettr, Rumble, and Truth Social, are not members of the TNI. *See, e.g.*, CD Media, Truth Social, https://truthsocial.com/@CDMedia; CD Media, Gettr, https://gettr.com/user/cdmedia; CD Media, Rumble, https://rumble.com/c/CDMedia. As the existence of Plaintiffs' social media profiles on these sites are publicly available and Defendants offer them simply for their existence, the Court may properly take judicial notice of them. *See Boyd v. Canadian Indep. Sch. Dist.*, No. 2:21-CV-95-Z-BR, 2022 WL 837933, at *1 (N.D. Tex. Feb. 17, 2022) ("The Court takes judicial notice that Plaintiff's social media post regarded [a specific topic]."), *report and recommendation adopted*, No. 2:21-CV-95-Z-BR, 2022 WL 837195 (N.D. Tex. Mar. 21, 2022); *see also Lifeway Foods, Inc. v. Millenium Prods., Inc.*, No. CV 16-7099-R, 2016 WL 7336721, at *1 (C.D. Cal. Dec. 14, 2016) (determining public social media page "properly subject to judicial notice" when offered to illustrate the public nature of the page).

the reference is about *Apple*.  *Id.* at 50 & 50 n.300.  Similarly, the Complaint alleges that news

aggregators "attract 80% of the online news traffic in the United States," AC ¶ 213, but three of

the five aggregators underlying that statistic are not TNI members: Yahoo! News, Buzzfeed, and

Huffington Post, *see* Doh-Shin Jeon & Nikrooz Nasr, *News Aggregators and Competition Among*

*Newspapers on the Internet*, 8 Am. Econ. J.: Microeconomics 91, 91 (2016).

     In addition, the Complaint's attempt to quantify the market power of the "TNI Big Tech

Members" (*i.e.*, the Platforms) is plainly deficient.  The Complaint contends that "the TNI's Big

Tech Members collectively have a gatekeeping power over at least 90% of online news traffic, in

the sense that a small news publisher de-platformed by the TNI's Big Tech Members loses at least

90% (and probably significantly more) of its traffic."  AC ¶ 228.  But there are two problems with

this assertion.  First, the amount of traffic that comes from Platforms says nothing about market

power in the alleged relevant market for online news, *i.e.*, the entities that actually publish news.

Plaintiffs need to plausibly assert that Defendants have market power in this market, but do not

(and cannot).  Second, even if looking at distribution channels were relevant to assess market

power, the 90% figure is irrelevant because it describes only traffic to "small news publisher[s],"

not the market as a whole.  Any meaningful assessment of market power must reflect the entire

actual market, including, for example, not only Defendants and Platforms, but also countless online

news publishers and news aggregators that are not TNI members.

     Because TNI members comprise only a small subset of online news publishers and

specifically exclude numerous other popular publishers and aggregators of online news content,

Plaintiffs cannot establish that the alleged group has sufficient market power to support a *per se*

claim.  *See, e.g.*, *Flaa v. Hollywood Foreign Press Ass'n.*, 55 F.4th 680, 690 (9th Cir. 2022) ("[T]he

complaint does not plausibly allege that the HFPA—a group of 85 entertainment journalists, only

half of whom are 'active' journalists—possesses market power in any reasonably defined market."); *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, No. 3:21-CV-448-BJD-LLL, 2022 WL 17478298, at *17 (M.D. Fla. July 27, 2022) (granting motion to dismiss where plaintiff failed to plead what percentage of the market as a whole "joined the boycott" or quantify "what the effect of the boycott was vis-à-vis the relevant market") (citation omitted).

>    **2.**    **The Complaint Fails To Allege TNI Members Cut Off Plaintiffs' Access to Any Facility Necessary To Compete, or That Plaintiffs Were Foreclosed from a Relevant Market.**

The second *per se* factor is whether the alleged boycott "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete." *Nw. Wholesale Stationers*, 472 U.S. at 294.  The Complaint fails to allege sufficient facts to plausibly establish that the TNI boycott prevented them from competing in the alleged online news market.  Plaintiffs' own allegations show that they are still generally able to publish their own content (and thus, compete) both on their own websites and even on TNI member Platforms, not to mention other "dominant" platforms outside the TNI group.

The Complaint itself illustrates that Plaintiffs continue to post their own content to remain competitive in the marketplace.  For example, the Complaint alleges that Jim Hoft's Gateway Pundit website is "one of the Internet's most popular and important conservatively oriented destinations for news and commentary," AC ¶ 75, which proves that he still is able to compete in the alleged online news market.  The other Plaintiffs continue to publish their own content through their own websites as well, including Children's Health Defense and Mr. Kennedy, *id.* ¶ 39, CD Media, *id.* ¶ 56, Erin Elizabeth Finn, *id.* ¶ 63, Benn Swann, *id.* ¶ 86, and Ty and Charlene Bollinger, *id.* ¶ 95.  Plaintiffs continue to have access to the Internet and audiences.

While the Complaint alleges that "exclusion from the world's dominant Internet platforms means being shut out of the market[,]" *id.* ¶ 236, for the reasons discussed *supra*, Plaintiffs have

not been.  Plaintiffs cannot show that they were excluded from alleged "dominant" platforms or news aggregators identified in the Complaint that are not TNI members, such as Apple, Yahoo! News, Buzzfeed, and Huffington Post (and if they were, it was not as a result of a TNI boycott).  *See supra* at 15–16.  Nor does the Complaint address Plaintiffs' ongoing access to numerous other popular social media platforms, such as Gettr, Rumble, and Truth Social.  *See supra* note 8.  Thus, the Complaint does not and cannot allege that the TNI member Platforms "have *exclusive* access to an element essential to effective competition."  *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 709–11 (D. Minn. 2011) (emphasis added).

In fact, Plaintiffs continue to have access to the very TNI-member Platforms that they claim are indispensable.  AC ¶ 63.  Even accepting as true Plaintiffs' allegations that they occasionally had content removed, *id.* ¶¶ 358–464, Plaintiffs do not and cannot allege that they have been "de-platformed" or excluded from a critical mass of the TNI member Platforms.  Rather, they all maintain access to the overwhelming majority of their accounts.[9]  Plaintiffs continue to actively use these Platform accounts to publish their content on a frequent basis, including to publicize this very lawsuit, to millions of readers.  *See, e.g.*, Robert F. Kennedy Jr., Twitter, (Jan. 10, 2023), https://twitter.com/RobertKennedyJr/status/1612996075731783680?s=20 ("BREAKING: Today, we filed a landmark lawsuit against legacy media for censoring COVID-related content.").

Because they maintain substantial access to publish online news, Plaintiffs cannot plausibly

---

[9] Every Plaintiff maintains at least three active Platform accounts across Facebook, Instagram, LinkedIn, Twitter, and YouTube.  For example, Dr. Joseph Mercola maintains all five.  *See, e.g.*, https://www.facebook.com/doctor.health; https://www.instagram.com/drmercola/; https://www.linkedin.com/in/drmercola/; https://www.youtube.com/@mercolapromos; and https://twitter.com/mercola.  And every Plaintiff other than CD Media maintains an active Twitter account, while every Plaintiff other than Erin Finn has an active Facebook account.  Because Plaintiffs have incorporated the status of their social media accounts into the Complaint, the Court can take judicial notice that they remain active.  *See Boyd*, 2022 WL 837933, at *1.

establish that the alleged boycott "cut off access . . . necessary . . . to compete[.]" *Nw. Wholesale Stationers*, 472 U.S. at 294; *see Johnson Bros.*, 830 F. Supp. 2d at 709–11.

### 3. The Complaint Fails To Allege Facts Demonstrating That the TNI Lacked Any Plausible Procompetitive Justifications.

The third *per se* factor is whether plaintiffs sufficiently allege "practices [that] were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Nw. Wholesale Stationers*, 472 U.S. at 294. Plaintiffs do not and cannot allege that the supposed agreement lacked plausible procompetitive justifications.

Information-sharing regarding objectionable content is procompetitive because it enables website operators, including Platforms, to more effectively identify that content (as they define it), and moderate it consistent with their own policies. Congress has specifically protected websites' right to moderate content consistent with their terms of service in this way. *See* 47 U.S.C. § 230(c)(2). Specifically, Section 230's "Good Samaritan" provision was designed "to encourage and immunize content moderation." *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1031 (N.D. Cal. 2021) (emphasis and citation omitted). Congress designed the law to allow websites "to restrict or to enable restriction of access to objectionable online material." *Id.* (quoting the bicameral Report).

Here, at most, the Complaint alleges that Defendants agreed to inform the Platforms about certain content that they considered to be disinformation. *See supra* Section I at 8–10. Providing such information to allow the Platforms to assess whether the content violates their policies is procompetitive, as the Platforms cannot flag all potentially objectionable content on the Internet. It is then up to the Platforms to independently determine whether or not the content violates their polices, and if so, the appropriate remedy. This is entirely consistent with Congress' own design to protect a "vibrant and competitive free market" on the Internet. *See* 47 U.S.C. § 230(b)(2).

Because there are plausible procompetitive justifications for the alleged conduct, the Complaint fails to plead allegations sufficient to satisfy the third prong of the *per se* test.

### B.   The Complaint Fails To Plead a Rule of Reason Violation.

Because Plaintiffs cannot satisfy the *per se* requirements, their case should be dismissed unless they can plausibly allege a rule of reason violation, *i.e.*, "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, No. 5:17-CV-1295-RCL, 2022 WL 980791, at *4 (W.D. Tex. Mar. 31, 2022) (citation omitted) (granting motion to dismiss). To succeed, they must demonstrate that the "anticompetitive evils" of the alleged conduct outweigh "its procompetitive benefits." *Marucci*, 751 F.3d at 376. "A restraint should not be deemed unlawful, even if it eliminates a competitor from the market, so long as sufficient competitors remain to ensure that competitive prices, quality, and service persist." *Id.* at 377.

The Complaint attempts to satisfy the rule of reason standard by alleging the TNI's alleged boycott has reduced the output of news available to consumers, the quality of the news, and consumer welfare. AC ¶¶ 529–541 (Count 2). These conclusory allegations fail to satisfy Plaintiffs' rule of reason burden because the alleged harm to Plaintiffs is insufficient to demonstrate a material impact on the market or competition, and, as described below, Plaintiffs fail to allege harm to any other competitors and indeed competition itself in the so-called market.

First, the Complaint alleges that the "output of news available to consumers" has decreased. AC ¶ 535. But the Complaint fails to quantify this supposed reduction in output or otherwise offer any plausible allegations about any publishers other than Plaintiffs themselves. That is, as a matter of law, "insufficient." *See, e.g.*, *Taylor v. Christus St. Joseph's Health Sys.*, No. 5:04-CV-153-DF, 2006 WL 1582097, at *3 (E.D. Tex. Mar. 28, 2006). As in *Marucci*, Plaintiffs offer "no factual information about *other competitors* dropping out of the market." 751 F.3d at 377

(emphasis added).  The Complaint at most makes vague references to harms felt by anonymous "other online news publishers."  AC ¶ 535.  But these allegations are conclusory; the "Complaint fails to provide the identity of the [online news publishers] or demonstrate when and how" they were harmed.  *Marucci*, 751 F.3d at 377.  They are also implausible; a few unnamed publishers who were dissuaded from entering the market cannot have an anticompetitive effect on a market Plaintiffs have separately alleged is "exploding" with new entrants.  AC ¶ 157.  Because Plaintiffs have not established that the actions taken against them have had any material impact on overall market output, they have not pled harm to the overall market and competition therein.

Second, the Complaint alleges a loss in "quality."  *Id.* ¶ 534.  But once again, the Complaint offers no factual allegation to suggest that there was any impact beyond Plaintiffs' own publications.  The Complaint's assertion that Defendants somehow prevented "rival online news suppliers from publishing  competing  content," or blocked "consumers'  access  to  competing news," *id.* ¶ 536, is conclusory; no different than in *Marucci* where the plaintiff failed to offer sufficient "factual information" regarding "diminution in the quality of bats."  751 F.3d at 377.

Third, the Complaint makes a conclusory allegation that TNI members reduced "consumer welfare."  AC ¶ 537.  But the only support is a bare conclusion that the alleged boycott stifled speech, which is untethered to any economic effect.  The Complaint makes no allegation, whatsoever, of "significant price changes" in online news.  *Marucci*, 751 F.3d at 377.

Because the Complaint alleges "no factual information about other competitors dropping out of the market, significant price changes, or diminution in the quality," the restraint's "anticompetitive evils . . . are virtually non-existent," and Plaintiffs' rule of reason claim fails.  *Id.*

## III.    THE COMPLAINT FAILS TO PLEAD INJURY OR HARM TO COMPETITION.

As the Fifth Circuit has explained: "The Supreme Court has long held that suits under section 4 of the Clayton Act (15 U.S.C. § 15(a)) for violation of either Section 1 or Section 2 of

the Sherman Act require not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing." *Norris v. Hearst Tr.*, 500 F.3d 454, 465 & n.16 (5th Cir. 2007). A successful plaintiff must plead more than just the injuries it has sustained; it must also show that defendants' conduct negatively affects competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488–89 (1977). Plaintiffs must "show an actual or threatened injury 'of the type the antitrust laws were intended to prevent' that was caused by the defendant's alleged wrongdoing." *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 982 (D.C. Cir. 2017) (citation omitted). Where, as here, the Complaint has failed to plausibly allege that Defendants' alleged conduct caused antitrust injury and harm to competition, the case should be dismissed. *See, e.g., id.*; *Norris*, 500 F.3d at 468.

### A.     The Complaint Fails To Plead That Plaintiffs Suffered Antitrust Injuries.

Plaintiffs' alleged injuries do not give rise to antitrust standing because they are not the kind of economic injuries that "antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489, or were not plausibly caused by Defendants.

Most of the injuries alleged cannot constitute antitrust injury as a matter of law. The Complaint alleges that Defendants caused injury to "competition in the marketplace of ideas" by "suppressing competition in the marketplace of ideas," but this is not a cognizable antitrust injury. AC ¶¶ 37, 310. These alleged harms are harms to the free expression of viewpoints, like ideas, and therefore fall outside of the purview of antitrust laws. *See Adams v. Am. Bar Ass'n.*, 400 F. Supp. 219, 223 (E.D. Pa. 1975) ("The antitrust laws . . . clearly do not reach . . . 'free trade in ideas.'"); *Johnson*, 869 F.3d at 983 (the "marketplace of ideas" is not "regulated by the antitrust laws"). Plaintiffs also allege that they lost expected "private donations." AC ¶ 41. But lost donations cannot constitute antitrust injury for the simple reason they are not trade or commerce. *See Dedication & Everlasting Love to Animals v. Human Soc'y of the U.S., Inc.*, 50 F.3d 710,

712 (9th Cir. 1995) ("[T]he solicitation of contributions . . . is not trade or commerce, and the Sherman Act has no application to such activity.").  Finally, Plaintiffs also cannot support a claim with losses suffered outside the relevant market for online news, such as those allegedly incurred by a chiropractic practice or documentary film.  AC ¶ 399–400.  Injuries "experienced in another market" do not qualify.  *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001).

The only injuries the Complaint alleges that might arguably be considered cognizable economic harm in the relevant market are loss of advertising or subscription revenues.  *See, e.g.*, AC ¶ 368.  But the Complaint does not plausibly assert that these injuries flow from the alleged efforts of *Defendants*.  Plaintiffs fail at the first step because the Complaint does not allege that any Defendant ever flagged any Plaintiff's content to the Platforms that resulted in the alleged instances of demotion or "de-platforming."  *Norris*, 500 F.3d at 465 & n.16 (plaintiff must show injury "resulting from the alleged violation"); *Johnson*, 869 F.3d at 982.  They also fail at the second step because their alleged injuries are speculative and remote.  There are too many intervening junctures and decisions between Defendants' participation in the TNI and any customer's decision to advertise or subscribe with Plaintiffs.  *See McCormack v. NCAA*, 845 F.2d 1338, 1342 (5th Cir. 1988) ("The alleged connection, moreover, between [the Defendant's] actions and the [claimed injury] presents the sort of 'speculative' and 'abstract' causal chain that the Supreme Court has held insufficient to support antitrust standing.") (citation omitted).

### B.   The Complaint Fails To Plausibly Plead Injury to Competition.

Further, even if the injuries the Complaint alleges were sufficient antitrust injuries, the Complaint does not plausibly plead that these injuries (e.g., reduced visibility on one Platform of one of Plaintiffs' posts) will have any impact on overall competition in any relevant antitrust market.  Plaintiffs' "predominate focus on [their] own injury is misguided because antitrust laws are designed to protect competition, not competitors."  *Marucci*, 751 F.3d at 376.  "[A]n antitrust

plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare." *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (quotations and citations omitted). For the reasons discussed *supra* Section II(B), the Complaint alleges no plausible harm to competition. "Accordingly, relief is not available for [them]." *Marucci*, 751 F.3d at 376; *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) (plaintiffs' "speculation about anticompetitive effects is not enough.").

## IV.    THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE ACTIONABLE CONDUCT BY EACH OF THE DEFENDANTS.

All claims against named Defendants should be dismissed for the additional reason that the Complaint fails to plead that each Defendant engaged in any relevant conduct. "Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436–37 (6th Cir. 2008); *see also SD3, LLC v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 422 (4th Cir. 2015) (Where the complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed."). A plaintiff must allege "specific *facts* demonstrating an intention on the part of [each defendant] to engage in a conspiracy." *Marucci*, 751 F.3d at 375 (emphasis in original); *EuroTec Vertical Flight Sols.*, 2019 WL 3503240, at *15 n.9 (lack of facts showing specific defendants' participation in the alleged conspiracies "is fatal to Plaintiff's claims."). Here, the Complaint fails to make plausible allegations to tie any of the Defendants to an unlawful group boycott.

Although the Complaint contains hundreds of paragraphs of allegations, it describes very little conduct undertaken by individual Defendants, as opposed to the Platforms. AC ¶¶ 357–464. In support of the Complaint's allegation that "[e]ach and every Plaintiff has been victimized by the TNI's joint agreement and concerted action," Plaintiffs point to no conduct undertaken

specifically by Defendants.  *Id.* ¶¶ 354–464.  There is no plausible allegation that any Defendant ever took any action with regard to Plaintiffs' online content.  This "fall[s] significantly short of the required pleading threshold."  *Total Benefits*, 552 F.3d at 436.

The allegations regarding The AP, Post, and Reuters are especially barren, with little beyond allegations of their mere membership in the TNI and status as publishers.  Each of these Defendants is mentioned fewer than ten times in the Complaint.  With regard to The AP, the only other specific allegations are that it published news articles about the origin of COVID-19.  AC ¶¶ 334–37.  Similarly, the only specific allegations about the Post are that it published news articles about (1) ivermectin, *id.* ¶¶ 346–349, and (2) a YouTube ban, *id.* ¶ 460, *see supra* note 6.  But such news coverage has nothing to do with the alleged group boycott.

Similarly, there are no allegations about any conduct undertaken by Reuters.  Plaintiffs allege, at most, that Reuters is a member of the TNI (AC ¶¶ 3, 173, 297), is a "traditional news organization" offering an online news website and wire service (*Id.* ¶¶ 126, 178, 179), and competes with other providers of online news (*Id.* ¶ 196).  Reuters is not even mentioned in the Complaint's sections alleging TNI's boycott of certain news publishers, coordinated censorship decisions, parallel treatment of prohibited claims, or Plaintiffs' denied access to critical facilities.  *See id.* ¶¶ 298–464.  As with the other Defendants, there is no allegation that Reuters ever notified anyone about any content—let alone Plaintiffs' content—pursuant to the TNI.

Where, as here, the Complaint "fails to allege particular facts against [multiple] particular defendant[s]," they "must be dismissed."  *SD3*, 801 F.3d at 422; *Marucci*, 751 F.3d at 375.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court grant Defendants' motion and dismiss Plaintiffs' Amended Complaint in its entirety.

Dated: April 18, 2023

Respectfully submitted,

*/s/ Leslie E. John*

Leslie E. John (*pro hac vice*)
johnl@ballardspahr.com
Elizabeth P. Weissert (*pro hac vice*)
weisserte@ballardspahr.com
Kayla R. Martin (*pro hac vice*)
martinkr@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500; Fax: (215) 864-8999

Jay Ward Brown (*pro hac vice*)
brownjay@ballardspahr.com
Ballard Spahr LLP
1909 K Street N.W., 12th Floor
Washington, D.C. 20006
Tel: (202) 661-2200; Fax: (202) 661-2299

Timothy C. Williams (SBN 24067940)
tim.williams@sprouselaw.com
Sprouse Shrader Smith PC
701 S Taylor Street, Suite 500
Amarillo, TX 79101
Tel: (806) 468-3346; Fax: (806) 373-3454

*Attorneys for The Associated Press*


*/s/ Justina Sessions*

Justina Sessions (*pro hac vice pending*)
jsessions@wsgr.com
Wilson Sonsini Goodrich & Rosati
One Market Plaza, 1 Market Street Suite 3300
San Francisco, CA 94105
Tel: (415) 947-2000; Fax: (650) 493-6811

Jeffrey C. Bank (*pro hac vice pending*)
jbank@wsgr.com
Wilson Sonsini Goodrich & Rosati
1700 K Street, N.W., 5th Floor
Washington, D.C. 20006

*/s/ John E. Schmidtlein*

John E. Schmidtlein (*pro hac vice*)
jschmidtlein@wc.com
Thomas G. Hentoff (*pro hac vice*)
thentoff@wc.com
Nicholas G. Gamse (*pro hac vice*)
ngamse@wc.com
Kathryn E. Garza (*pro hac vice*)
kgarza@wc.com
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Tel: (202) 434-5000; Fax: (202) 434-5029

Thomas C. Riney (SBN 16935100)
tom.riney@uwlaw.com
C. Jason Fenton (SBN 24087505)
jason.fenton@uwlaw.com
Underwood Law Firm, P.C.
500 S. Taylor Street, Suite 1200
Amarillo, TX 79101
Tel: (806) 379-5613; Fax: (806) 379-0316

*Attorneys for WP Company LLC*

Tel: (202) 973-8800; Fax: (202) 973-8899

David M. Russell  (SBN 17409300)
david@srlawtx.com
Smithee & Russell, LLP
320 S. Polk Street, Suite 920
Amarillo, TX 79101
Tel: (806) 322-9200; Fax: (806) 322-9201

*Attorneys for Reuters News & Media Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Counsel hereby certifies that on the 18th day of April 2023, notice of the foregoing pleading was provided via the CM/ECF system to the counsel of record.  In addition, notice was provided via email to the following counsel.

*/s/ John Schmidtlein*       

John E. Schmidtlein

Jed Rubenfeld
rubenfeldjed@gmail.com
1301 Forest Road
New Haven, CT 06515